*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 05a0055p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellant,*

No. 03-2535

*v.*

DONNY G. DOUGLAS; JAY CAMPBELL,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 02-80863-1; 02-80863-3—Nancy G. Edmunds, District Judge.

Argued: December 7, 2004

Decided and Filed: February 8, 2005

Before: MARTIN and MOORE, Circuit Judges; BUNNING, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant. Harold Z. Gurewitz, GUREWITZ & RABEN, Detroit, Michigan, for Appellees. **ON BRIEF:** Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellant. Harold Z. Gurewitz, GUREWITZ & RABEN, Detroit, Michigan, Peter J. Kelley, Ann Arbor, Michigan, for Appellees.

_____

## OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge. The United States appeals the district court's dismissal of its three-count indictment for insufficiency to plead an offense. The indictment charges Donny G. Douglas and Jay Campbell with conspiracy to violate federal labor law, conspiracy to extort, and mail fraud. We find that the indictment sufficiently alleges these offenses. Therefore, we REVERSE and REMAND.

_____

[*] The Honorable David L. Bunning, United States District Judge for the Eastern District of Kentucky, sitting by designation.

1

I.

Donny G. Douglas is a former United Auto Workers International servicing representative, and Jay Campbell is a former United Auto Workers Local 594 Chairman. The Local 594 unit of United Auto Workers represents over five thousand production and skilled trade employees at General Motors's Pontiac Truck facilities. The terms of employment for Pontiac employees are set forth in the National Agreement between General Motors and International United Auto Workers and in the Local Agreement between Pontiac and Local 594. Once national union officials and General Motors management agree to the terms of the National Agreement, local union officials and Pontiac management negotiate the terms of the Local Agreement. The National Agreement provides that an employee may be eligible to receive the designation of "skilled tradesman" after completing various education and training requirements. A skilled tradesman may bid upon various skilled trade positions, which pay in excess of $100,000 per year. Skilled tradesmen are hired according to a scale of preference: most preferred are skilled trade employees; next are current company employees who are qualified under the National Agreement; after that are current company employees. Outside applicants who do not meet the requirements set forth in the National Agreement are accorded no preference. The terms of the Local Agreement must not violate the terms of the National Agreement.

The charges against Douglas and Campbell are based on their conduct during contract negotiations for the Local Agreement between United Auto Workers Local 594 and General Motors. In 1995, defendants demanded that Pontiac hire Gordon Campbell, Jay Campbell's son, and Todd Fante, the son-in-law of a former Local 594 official—who were not employees of Pontiac or General Motors and were not qualified under the National Agreement as skilled tradesmen—into skilled trade positions. General Motors and United Auto Workers officials refused.

In 1996, General Motors and the International United Auto Workers signed a three-year National Agreement. Local 594 and Pontiac began negotiations for the Local Agreement. Defendants renewed their demands that Pontiac hire Campbell and Fante as skilled tradesmen.

In April 1997, Local 594 began a strike that lasted eighty-seven days. By July 1997, the parties had settled all issues involved in the strike except for defendants' demands that Campbell and Fante be hired into skilled trade positions. The United States alleges that in order to end the strike Pontiac Truck agreed to create the two new positions and fill them with Campbell and Fante. As part of the Local Agreement, the parties signed a "skilled trades proposal," which the United States asserts signified Pontiac's acceptance of defendants' demand for the two new hires.

The Local 594 Constitution requires that new Local Agreements be ratified by the membership of Local 594. The United States alleges that defendants submitted the "skilled trades proposal" to Pontiac employees in an altered form that omitted the provisions for the two new positions. Pontiac employees ratified the proposal and, in August 1997, Fante and Campbell were hired to fill two new skilled trade positions. The United States alleges that "because their hiring violated the National Agreement, the [Local 594 Constitution,] and the Local Agreement, other employees reacted angrily and filed two grievances." The United States alleges that another Local 594 official, William Coffey—who was originally named as a defendant in this case but has since passed away—concealed that Campbell and Fante were not qualified by agreeing to withdraw those grievances and any other grievances related to the two new skilled trade positions.

Defendants were charged in 2002 in a three-count indictment. Count One alleged that defendants violated 18 U.S.C. § 371 by conspiring to violate the Labor-Management Relations Act. The indictment identified the objects of the conspiracy as (1) the authority to amend the terms of the National Agreements and related documents and (2) the employment and skilled trades designation for Campbell and Fante. Count Two charged defendants with conspiring to obstruct, delay, and

affect commerce in violation of the Hobbs Act, 18 U.S.C. § 1951.  Count Three alleged that defendants used a scheme and artifice to defraud members of Local 594 of their contractual right to obtain skilled trade positions and to rely on the honest services of defendants as the union's negotiating officials.

Defendants moved to dismiss, arguing that the indictment failed to allege offenses and was preempted by federal labor law.  The district court concluded that the indictment failed to allege offenses and dismissed the case without considering the preemption question.

## II.

An indictment is sufficient if it "set[s] forth the offense in the words of the statute itself, as long as 'those words . . . fully, directly, and expressly . . . set forth all the elements necessary to constitute the offense intended to be punished.'" *United States v. DeAndino*, 958 F.2d 146, 147 (6th Cir. 1992) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  In dismissing the indictment in this case, the district court applied the rule of lenity, which limits the expansion of criminal statutes by means of defining essential terms or elements of wrongful conduct to include "constructive" offenses or offenses not intended by Congress.  According to the rule, a statute must be strictly construed, *United States v. Enmons*, 410 U.S. 396, 411 (1973), and constructive offenses should be avoided, *McNally v. United States*, 483 U.S. 350, 360 (1987).  The district court construed the statutes at issue to exclude defendants' conduct, concluding that "the indictment is only sufficient if the Court were to create numerous constructive offenses."  Accordingly, we must consider what offenses, and their elements, Congress intended to prohibit when it enacted the statutes at issue in this case.  Because Congress's intent is essentially a question of statutory interpretation, we review the district court's decision de novo.  *United States v. Spinelle*, 41 F.3d 1056, 1057 (6th Cir. 1994); *United States v. Brown*, 915 F.2d 219, 223 (6th Cir. 1990).

## III.

1.     Count One

Count One alleges that defendants violated 18 U.S.C. § 371, which criminalizes a conspiracy to commit a crime against the United States or to defraud the United States by conspiring to violate the Labor-Management Relations Act, 29 U.S.C. §§ 186(a)(1), 186(b)(1).  Section 186(a)(1) provides:

> It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, advisor or consultant to an employer, or who acts in the interest of an employer, to pay, lend, or deliver, or agree to pay, lend, or deliver any money, or other thing of value—
> (1)     to any representative of any of his employees who are employed in an industry affecting commerce.

Section 186(b) provides:

> It shall be unlawful for any person to request, demand, receive or accept or agree to receive or accept any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section.

Violations of sections 186(a) and 186(b) both require a showing of a "thing of value."  The indictment identifies the objects of the conspiracy as (1) the authority to amend the terms of the National Agreement and related documents and (2) the employment and skilled trades designation for Campbell and Fante.

Defendants argued, and the district court agreed, that neither the authority to amend the National Agreement nor the procurement of jobs for third parties qualifies as a thing of value under the statute. The district court reasoned that because defendants did not conspire for "things of value," they did not engage in the acts prohibited by either section of the Act. The court concluded that absent an allegation that defendants violated the substantive statute, they necessarily could not have violated section 371, and, thus, the indictment did not allege a criminal offense.

The United States argues that in making a determination regarding "things of value," the district court acted beyond its authority.[1] Instead, the government contends, the district court should have considered only the sufficiency of Count One in alleging a violation of section 371, and to that analysis the "thing of value" inquiry is irrelevant.

We agree that the district court's scope of analysis was improper. It has been determined, by this Court and in other circuits, that a conviction under section 371 does not require the government to prove a violation of a separate substantive statute. *See United States v. Khalife*, 106 F.3d 1300, 1303 (6th Cir. 1997) (citing *United States v. Jackson*, 33 F.3d 866, 871-72 (7th Cir. 1994) (holding that the government may allege a violation of a specific statute to demonstrate a conspiracy to defraud the United States, but such an allegation is only "a way of consummating the conspiracy . . . which, like the use of a gun to effect a conspiracy to murder, is purely ancillary to the substantive offense") (quoting *Glasser v. United States*, 315 U.S. 60, 67 (1942))). "[I]t is unnecessary to refer to any substantive offense when charging a section 371 conspiracy to defraud, and it is also unnecessary to prove the elements of a related substantive offense." *Khalife*, 106 F.3d at 1303. Therefore, the allegations in the indictment that defendants violated section 371 need not include reference to "things of value" under 29 U.S.C. § 186.

Given this, we must determine whether the indictment satisfies the requirements of Federal Rule of Criminal Procedure 7(c)(1), which states:

> The indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government. It need not contain a formal introduction or conclusion. A count may incorporate by reference an allegation made in another count. A count may allege that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means. For each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.

We have said that to be sufficient an indictment must satisfy two requirements: "first, the indictment must set out all of the elements of the charge offense and must give notice to the defendant of the charges he faces; second, the indictment must be sufficiently specific to enable the defendant to plead double jeopardy in a subsequent proceeding, if charged with the same crime based on the same facts." *United States v. Martinez*, 981 F.2d 867, 872 (6th Cir. 1992) (citing *Russell v. United States*, 369 U.S. 749, 763-64 (1962)).

The elements of a section 371 conspiracy to defraud are: (1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense, i.e., to defraud the United States. *See*

---

[1]The United States has elected not to appeal the district court's finding that the employment and authority to amend were not "things of value."

*Khalife*, 106 F.3d at 1303 (quoting *Jackson*, 33 F.3d at 872). Count One describes the objective of the conspiracy, the means and methods in furtherance of that objective, and the overt acts taken to achieve it. As stated above, the United States need not prove the illegal objective, the intent, or the violation of the substantive offense. Count One sets forth all of the elements of the offense, gives notice to the defendant of the charges, and is sufficiently specific to enable defendants to plead double jeopardy in a subsequent proceeding if charged with the same crime based on the same facts. *See id.*; *Martinez*, 981 F.2d at 872. Thus, Count One sufficiently alleges a violation of section 371.

2.       Count Two

Count Two charges defendants with conspiring to obstruct, delay, and affect commerce in violation of the Hobbs Act, 18 U.S.C. § 1951. In essence, this is an extortion claim: the United States claims that defendants obtained employment for Campbell and Fante by inducing General Motors through the wrongful use of fear of economic harm, i.e., a prolonged strike. The Act defines extortion in part as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear." 18 U.S.C. § 1951(b)(2). Count Two alleges that defendants obtained the consent of Pontiac to hire Campbell and Fante—as evidenced by Pontiac's "skilled trade proposal"—by refusing to agree to the terms of the Local Agreement until the two jobs were secured.

The district court determined that Count Two was insufficient because it failed to allege an illegal objective, citing to the Supreme Court's holding in *United States v. Enmons*, 410 U.S. at 400. In *Enmons*, the Supreme Court limited the Hobbs Act

> to those instances where the obtaining of the property would itself be "wrongful" because the alleged extortionist has no lawful claim to that property. Construed in this fashion, the Hobbs Act has properly been held to reach instances where union officials threatened force or violence against an employer in order to obtain personal payoff, and where unions used the proscribed means to exact "wage" payments from employers in return for "imposed, unwanted, superfluous, and fictitious services" of workers.

*Id.* The Court held that when force is used to obtain legitimate union demands, such as higher wages, the Hobbs Act does not apply. *Id.* at 410.

Based on that holding, the district court found that negotiating for additional jobs is a legitimate objective, and that, because defendants' actions were merely negotiating tactics for additional jobs, their objective was legitimate. The court explained that it is only an unfair labor practice to cause an employer to pay a thing of value "for services which are not performed or not to be performed." It distinguished that situation from cases, such as this one, where an employer is forced to pay for services which were actually performed or intended to be performed. Thus, it concluded, the Count alleges no criminal act.

The United States argues that the court erred in finding that defendants' objective was legitimate because the demand for the two jobs was contrary to an existing collective bargaining agreement and to the Local 594 Constitution. Based on this Court's holding in *United States v. Cusmano*, 729 F.2d 380, 381-83 (6th Cir. 1984), the United States argues that an objective that violates an existing collective bargaining agreement cannot be regarded as legitimate under *Enmons*, even where the jobs obtained are duly performed. The government contends that because the indictment alleges that defendants' objective violated the United Auto Workers Constitution and the National Agreement, it necessarily alleges an illegal objective.

As the United States indicates, this Court distinguished the holding of *Enmons* in *Cusmano*, where we explained that the Hobbs Act presents no bar to prosecution where an accused is alleged

to have extorted property to which he has no lawful claim. 729 F.2d at 381-83 (citing *United States v. Iozza*, 420 F.2d 512, 515 (4th Cir. 1970)). The *Cusmano* court held that Cusmano's activities in extracting money, to which he had no lawful claim, through an agreement that he forced on his employees was not protected under the rule of *Enmons*. *Id.* at 382. The agreement between Cusmano's company and its employees provided that it would be "unlawful and illegal" for the company to deduct the welfare and pension payments from the employees' gross earnings. *Id.* at 382-83. The agreement was not the result of any collective bargaining between the company and the employee's union, "but instead was secured through the coercive tactics of Cusmano and his codefendants [who were prosecuted in the companion case of *United States v. Russo,* 708 F.2d 209 (6th Cir. 1983)]." *Id.* at 383. This Court concluded:

> We believe Cusmano's attempt to characterize his behavior as protected labor activity stretches *Enmons* too far. He claims he had a legal right to bargain with his employees in an attempt to reduce [the company's] labor costs. Although he might have this right, the facts proven at trial do not establish any legitimate bargaining by Cusmano in an attempt to reduce [the company's] labor costs. Instead, the evidence discloses that he and his codefendants coerced the [employees] into an illegal agreement which required the [employees] to pay for pension contributions which Cusmano should have paid. The facts demonstrate Cusmano attempted to obtain by wrongful means and under the guise of a "service charge" an objective which the parties' own contract specifically declared "unlawful and illegal." This conduct went beyond legitimate labor tactics and violated the Hobbs Act.

*Id.* (citations omitted). We also concluded that, had we applied Cusmano's view that his activities were legitimate and protected under *Enmons*, the Hobbs Act would then "pose no bar against the utilization of sham agreements even though such agreements were obtained outside the traditional labor/management bargaining context." *Id.* We declined to adopt such a restricted view. *Id.*

Here, the district court discussed the application of *Cusmano* and its companion case, *United States v. Russo*. The court found that those cases are distinguishable

> because [in *Cusmano* and *Russo*] the employer made its demands on individual employees to pay extra fees to the employer, to which the employer was not entitled under the existing contract and which the membership collectively rejected. Here, Defendants' alleged demands were made in the course of negotiating the new local collective bargaining agreement which, if the parties reached an agreement, could have provided for the two positions, and thus the positions would not have been in violation of at least one of the governing contracts. Whether or not the inclusion of that provision in the new agreement between Pontiac Truck and Local 594 would have violated other contractual provisions between the [United Auto Workers] and General Motors should not be the basis of a criminal charge of extortion—that is an issue to be resolved between the [union], Local 594, General Motors and Pontiac Truck through the established labor relations' dispute framework.

As this statement indicates, the district court found that demands by force for an objective that violates a contract between the union and the employers do not constitute extortion when resolution of such violation is better achieved in the traditional labor-management dispute resolution process.

We disagree. The defendants' demands, as alleged by the United States, are illegitimate, as they were in *Cusmano* and *Russo*, and constitute extortion because they were in contradiction of the collective bargaining agreement and the union's Constitution. Like the unlawful agreement at issue in *Cusmano*, the "skilled trades proposal" allegedly was obtained outside the traditional labor/management bargaining context. Also, the proposal, as alleged, contradicted a contractual

provision between the union and the employers that gave preference to qualified, eligible employees of Pontiac in the distribution of skilled trade jobs and required at a minimum that those who are hired meet specific standards. We conclude that this is one of those instances, referenced by the Supreme Court in *Enmons*, to which the Hobbs Act would apply. Furthermore, the indictment sufficiently alleges that defendants forcefully coerced Pontiac negotiators to exact wage payments in return for the imposed and unwanted services of unqualified, ineligible non-employees. Therefore, we reverse the ruling of the district court as to Count Two.

3.      Count Three

Count Three charges defendants with mail fraud in violation of 18 U.S.C. §§ 1341, 1346. The indictment alleges a scheme to deprive Local 594 members of the following rights conferred by the National Agreement and the United Auto Workers Constitution: (1) the contractual right to obtain a skilled trades designation, (2) the skilled trades designation and associated wages and benefits for two undetermined qualified employees, and (3) the honest services that defendants owed to Local 594 members to faithfully and fairly represent them. The district court, relying heavily on the Third Circuit's decision in *United States v. Boffa*, 688 F.2d 919 (3d Cir. 1982), held that neither the first two rights—the so-called property allegations—nor the honest services allegation is sufficient to support an indictment for mail fraud. Thus, we consider the scope of the mail fraud statute and the application of the Third Circuit's ruling to this case.

The mail fraud statute provides criminal penalties for devising "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1341. The Supreme Court long ago recognized that a "scheme or artifice to defraud" is not limited to the common law of fraud and false pretenses, *Durland v. United States*, 161 U.S. 306, 313-14 (1896), and since then courts have struggled to define the contours of the mail fraud statute. Generally, courts have construed it expansively to prohibit all schemes to defraud by any means of misrepresentation that in some way involve the use of the postal system. *United States v. Pearlstein*, 576 F.2d 531, 534 (3d Cir. 1978). Most courts have rejected the argument that the statute was intended to prohibit only schemes to defraud individuals of money or property, *see, e.g., United States v. States*, 488 F.2d 761, 763-64 (8th Cir. 1973), and instead have held that the statute prohibits schemes to defraud individuals of "intangible" interests or rights as well. *See United States v. Bronston*, 658 F.2d 920, 927 (2d Cir. 1981) (client's right to "undivided loyalty" of attorney).

In *United States v. Boffa*, the Third Circuit agreed that the statute's scope is expansive, but found that, as a matter of statutory construction, it was unwilling to sanction mail fraud prosecutions for schemes to deprive individuals of a particular intangible right when such a prosecution would contravene the intent of the Congress that created that right. 688 F.2d at 930 (citing *Great Am. S & L Assn. v. Novotny*, 442 U.S. 366, 372-76 (1979) (finding civil rights action under 42 U.S.C. § 1985(3) based on deprivations of rights guaranteed by the Civil Rights Act of 1964 impermissible where such action would undermine policies of Title VII of that Act)). In *Boffa*, the National Labor Relations Act provided the rights of which the employees were allegedly deprived, and it provided the remedy, which held no criminal consequences, for such deprivation. *Id*. The Third Circuit stated that it therefore perceived a strong indication that Congress did not intend for unfair labor practices related to the National Labor Relations Act to have any criminal consequences. *Id*. Because Congress had already provided specific remedial provisions for the violation of rights under that Act, the Third Circuit held that a scheme to deprive employees of their rights under that Act does not constitute a crime under the mail fraud statute. *Id*. It left open the possibility of applying the mail fraud statute to the deprivation of economic benefits unrelated to the National Labor Relations Act.

Indeed, the Third Circuit further held in *Boffa* that such acts do have criminal consequences under the mail fraud statute. *Id*. The indictment in that case alleged that defendants deprived employees of the "economic benefits they enjoyed through rights they had under the collective bargaining agreement." *Id*. The Third Circuit held that this scheme, which deprived employees of economic benefits such as wages and seniority rights, "lies squarely within the ambit of the mail fraud statute," because the source of such benefits was the contract between [defendants] and the employees." Thus, while deprivation of rights guaranteed by the National Labor Relations Act may, according to the Third Circuit, be vindicated solely through that Act's procedures for unfair labor practice disputes, schemes to deprive an individual of economic benefits that are contained in a collective bargaining agreement are subject to the criminal sanctions set forth in the mail fraud statute. *Id*. (citing *United States v. McNeive*, 536 F.2d 1245, 1248-49 (8th Cir. 1976) ("There can be little doubt that . . . schemes are within the scope of section 1341 [when] they involve calculated efforts to use misrepresentation or other deceptive practices to induce the innocent or unwary to give up some tangible property interest.")). We agree with that decision, and now look to determine whether the rights at issue in this case were guaranteed by the collective bargaining agreement.

  a.      Property Allegations

The government argues that the right to compete is an economic benefit guaranteed by the collective bargaining agreement, and, according to the Third Circuit's decision in *Boffa*, is a property interest whose deprivation is subject to criminal consequences under the mail fraud statute. In response, the district court held that

> the bargaining agreements, at most, guaranteed the membership the right to compete for skilled trade positions before any outside hires were considered for the positions, and that scheming to deny membership the right to compete for a job does not reach the level of scheming to deny membership wages which were promised in the agreements.

Basically, the court held that the right to compete for jobs may be valuable, but it is not valuable enough to constitute a property interest subject to the protections of the mail fraud statute. We must determine whether the right to compete constitutes a sufficient property interest.

The government explains that the collective bargaining agreement requires that skilled trade positions be filled by only qualified applicants and gives hiring preference to skilled trade employees. The government argues that this agreement guarantees wages and other financial benefits to qualified employees, and that such benefits constitute property. It cites to decisions of other circuits, including the Third Circuit's decision in *Boffa*, holding that wages and other financial benefits guaranteed by collective bargaining agreements are sufficient to constitute property for purposes of mail fraud convictions. *See United States v. Palumbo Bros., Inc.*, 145 F.3d 850, 873 n.3 (7th Cir. 1998); *Boffa*, 688 F.2d at 930. The district court distinguished those cases because they involved wages for active positions—i.e., positions currently filled by employees—that were subject to renegotiation, whereas this case involved only a right, held by qualified employees yet determined, to earn those wages.

The government disputes the court's distinction. At issue in *Boffa* were seniority rights that were used to determine which employee-drivers could bid on particular driving assignments. The government argues that the seniority rights at issue in that case are akin to the right to compete in this case: both rights are "job-bidding" rights and both fundamentally provide the right to compete for economic benefits and wages. However, in *Boffa*, the employees lost their wages as a result of unfair labor practices; here, the employees lost their right to compete for wages sometime in the future as a result of unfair labor practices. To the district court, the difference between workers currently employed and workers who may be employed sometime in the future was significant. The

court, noting the Supreme Court's decision in *Cleveland v. United States*, 531 U.S. 12 (2000), which held that unissued government licenses are not property, determined that the right to compete for a job is more akin to an unissued government license; neither rises to the level of wages and therefore does not constitute property for purposes of a mail fraud conviction. The district court found that the government, in aligning the right to compete with the right at issue in *Boffa*, was "stretching too far—scheming to deny membership the right to compete for a job does not reach the level of scheming to deny membership wages which were promised in the agreements."

We disagree. Although proof at trial may undermine the government's case, for purposes of the indictment the government has pleaded sufficiently. We are persuaded by the government's argument that, were the right to compete to have such little value—indeed, value equivalent to an unissued government license—then the union would not bother to bargain collectively for this hiring system. We find this right to be similar enough to the right at issue in *Boffa* to follow the Third Circuit's decision. The right to compete guaranteed by the collective bargaining agreement in this case is sufficient to constitute property for purposes of the mail fraud statute.

b.     Honest Services

Count Three also alleges a mail fraud scheme in violation of 18 U.S.C. § 1346, which explicitly prohibits a "scheme or artifice to deprive another of the intangible right of honest services." The indictment states that defendants intended to defraud the members of Local 594 of "[t]he honest services of defendants owed to Local 594 members pursuant to Article 19, of the [United Auto Workers] Constitution, Section 501(a) of the Labor Management Reporting and Disclosure Act, and the defendants' duty to faithfully and fairly represent the members of Local 594 as labor representatives." As the district court noted, Congress passed section 1346 in response to the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 360 (1987), where the Court held that the mail fraud statute did not include schemes to defraud others of honest services. *See United States v. Frost*, 125 F.3d 346, 364 (6th Cir. 1997).

Subsequently, in *Frost*, 125 F.3d at 364, this Court discussed the limits of an honest services claim. We said:

> Unlike a defendant accused of scheming to defraud another of money or property, a defendant accused of scheming to deprive another of honest services does not have to intend to inflict an economic harm upon the victim. Rather, the prosecution must prove only that the defendant intended to breach his fiduciary duty, and reasonably should have foreseen that the breach would create an identifiable economic risk to the victim.

The district court found that this statement in *Frost* identifies the elements of the honest services claim, and that the government could satisfy all of these elements except for the breach that would create an economic risk. The court found that the alleged breach—that defendants submitted a misleading contract for the membership's ratification and withdrew all grievances filed by local members regarding the hiring of Campbell and Fante—was insufficient because it constituted merely an unfair labor practice that is not properly the subject of criminal liability. The court cited to *Boffa*, where the Third Circuit said that to "permit mail fraud prosecutions grounded on unfair labor practices would be to impose criminal penalties for conduct that, until now, has been remediable solely under the [National Labor Relations Act]."

The government contends that the "breach" element identified by the district court is not actually an element of the honest services claim. The government argues that this Court has only identified the "breach" issue as an evidentiary burden, and therefore it is not properly the subject of a sufficiency-of-the-indictment inquiry. *Frost*, 135 F.3d at 367-69. The government, citing to *Frost*

and the case quoted therein, *United States v. Oldfield*, 859 F.2d 392, 400 (6th Cir. 1988), identifies the true elements of the claim as these: (1) devising or intending to devise a scheme to defraud (or to perform fraudulent acts); (2) involving a use of the mails; and (3) for the purpose of executing the scheme or attempting to do so. It explained that the *Frost* court's discussion of the "breach" issue in the paragraph quoted above occurred in an analysis and review of jury instructions concerning what the government was required to prove to establish that private individuals deprived their employer of the right to their honest services, *Frost*, 125 F.3d at 367-69; it did not occur in the discussion of the elements of the offense that must be stated in the indictment. Moreover, the government argues, the *Frost* court explicitly characterized the "breach" issue as an evidentiary burden. *Id.* at 369 ("Unlike a defendant accused of scheming to defraud another of money or property . . . a defendant accused of scheming to deprive another of honest services does not have to intend to inflict an economic harm upon the victim. Rather, the prosecution must prove only that the defendant intended to breach his fiduciary duty, and reasonably should have foreseen that the breach would create an identifiable economic risk to the victim. We do not believe that this standard imposes an especially rigorous evidentiary burden upon the prosecution."). "Nothing in *Frost*," the government argues, "suggests that [the] elements of proof (as opposed to the elements of the offense) must be alleged in the indictment."

The government accurately states the elements of the honest services charge. The indictment has only to allege that defendants devised a scheme to defraud, involving use of the mails for the purpose of executing the scheme. The indictment sufficiently makes these allegations.

4.      Preemption

Because the district court dismissed the indictment as insufficient, it did not discuss defendants' argument that the charges are preempted by the National Labor Relations Act. However, an appellate court may affirm a decision of the district court if that decision is correct for any reason, including a reason not considered by the district court. *Loftis v. United Parcel Serv.*, 342 F.3d 509, 514 (6th Cir. 2003). In the interest of judicial economy, we now consider the issue of preemption. *See Holloway Constr. Co. v. United States Dep't of Labor*, 891 F.2d 1211, 1212 (6th Cir. 1989).

Defendants argue that the alleged violations of 29 U.S.C. § 186, 18 U.S.C. § 1951, and 18 U.S.C. §§ 1341, 1346 are all "inextricably intertwined" with sections 7 and 8 of the National Labor Relations Act, because they all depend on a violation of the collective bargaining agreement. Therefore, the alleged violations are preempted under the *Garmon* doctrine. *See Garmon*, 359 U.S. at 245. At the outset, we note that there are no issues concerning 29 U.S.C. § 186, because, as we said above, it is not necessary to show any violation of that statute for purposes of this appeal. Thus, defendants' arguments relating to 29 U.S.C. § 186 are moot. We consider only the questions raised by defendants' preemption argument relating to 18 U.S.C. §§ 1951, 1341, 1346, and hold, for the reasons below, that preemption is unwarranted.

"As a general rule," *Garmon* establishes that "federal courts do not have jurisdiction over activity which is 'arguably subject to § 7 or § 8 of the [National Labor Relations Act],' and they 'must defer to the exclusive competence of the National Labor Relations Board.'" *Kaiser Steel Corp. v. Mullins*, 45 U.S. 72, 83 (1982) (quoting *Garmon*, 359 U.S. at 245). Under the doctrine, a federal district court may not have jurisdiction to determine whether an employer violates the National Labor Relations Act by allegedly engaging in unfair labor practices. *Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co.*, 484 U.S. 539, 543 n.4 (1988); *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 74 (1989); *Communications Workers of Am. v. Beck*, 487 U.S. 67, 74 (1989); *Storey v. Local 327, Int'l Bhd. of Teamsters*, 759 F.2d 517, 520 (6th Cir. 1985) (noting that when *Garmon* applies, "neither state nor federal courts have subject matter jurisdiction").

Like many general rules, however, this one contains exceptions. First, "federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies." *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 626 (1975); *accord Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 610-11 (6th Cir. 2004). And second, federal courts may decide criminal charges that allegedly involve federal labor law. *Palumbro*, 145 F.3d 850, 863 (holding as a matter of first impression that charges in a criminal indictment are not preempted by federal labor law, even assuming that the alleged acts underlying the indictments fall within the scope of federal labor law); *Boffa*, 688 F.2d at 931-33 (holding that *Garmon* did not preempt the court's consideration of a federal criminal statute prohibiting mail fraud). Because we believe, as our sister circuits have held, that *Garmon* was not intended to affect a district court's jurisdiction to hear criminal charges, we need not consider the issue of whether the federal labor law issues in this case are merely collateral.

It would be entirely inappropriate to strip federal courts of criminal jurisdiction merely because the criminal charges relate to federal labor law. We agree with the Third Circuit's decision in *Boffa*, which reasoned that when this kind of alleged conflict occurs, preemption would only be appropriate if, by enacting the National Labor Relations Act, Congress had intended to repeal the existing criminal statute. *Boffa*, 688 F.2d at 932-33. The *Boffa* court found no indication that Congress had such intention, and therefore held that *Garmon* preemption was inappropriate. *Id.* We also find no such indication. Therefore, we hold that *Garmon* preemption does not apply.

IV.

For the foregoing reasons, we REVERSE the district court's dismissal and REMAND for further consideration.