*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0042p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee/Cross-Appellant,*

  *v.*

DONNY G. DOUGLAS (07-1695/1850) and JAY
D. CAMPBELL (07-1696/1851),
  *Defendants-Appellants/Cross-Appellees.*

Nos. 07-1695/1696/1850/1851

_____

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-80863—Nancy G. Edmunds, District Judge.

Argued: January 20, 2011

Decided and Filed: February 10, 2011

Before: MARTIN and MOORE, Circuit Judges; BUNNING, District Judge.[*]

_____

## COUNSEL

**ARGUED:** N. C. Deday LaRene, LaRENE & KRIGER, P.L.C., Detroit, Michigan, Harold Gurewitz, GUREWITZ & RABEN, PLC, Detroit, Michigan, for Appellants. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** N. C. Deday LaRene, LaRENE & KRIGER, P.L.C., Detroit, Michigan, Harold Gurewitz, GUREWITZ & RABEN, PLC, Detroit, Michigan, for Appellants. Kathleen Moro Nesi, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

_____

[*]The Honorable David L. Bunning, United States District Judge for the Eastern District of Kentucky, sitting by designation.

———————————

**OPINION**

———————————

BOYCE F. MARTIN, JR., Circuit Judge.   Defendants-Appellants-Cross-Appellees Donny Douglas and Jay Campbell appeal their convictions under the Labor Management Relations Act and the Hobbs Act.  The United States cross-appeals their sentences.  This case is now in its eighth year of litigation.  Some of the underlying events transpired over seventeen years ago.  Our court, and this same panel, heard a first appeal in this case more than six years ago.  *United States v. Douglas*, 398 F.3d 407 (6th Cir. 2005).   For the following reasons, we **AFFIRM** Douglas's and Campbell's convictions, and although we would prefer to end these lengthy proceedings and give closure to the parties, we must **REMAND** for resentencing.

## I.  BACKGROUND

Donny Douglas and Jay Campbell worked as representatives of the United Auto Workers at the General Motors factory in Pontiac, Michigan.  While negotiating with General Motors in the 1990s, they pressured General Motors several times to give highly skilled, "journeyman" jobs to two non-qualified relatives of Union members.  These jobs paid as much as $150,000 per year, which was approximately double the salary of a production line worker.  General Motors refused to comply each time.  Acquiescing would have violated the hiring priorities set forth in the national and local agreements between the Union and General Motors.  The pressure came to a head when the Union was on strike in 1997, costing General Motors millions of dollars each day.  On the eighty-seventh day of the strike, Union leaders met with representatives from General Motors to attempt to resolve all their issues and end the strike within twenty-four hours. The parties successfully resolved every official issue and grievance between them within twenty-four hours, but Douglas informed James Rhadigan, a General Motors official, that the strike would not end unless the two unqualified relatives of Union members finally received journeyman jobs.   Rhadigan relented, the non-qualified relatives received the journeyman jobs, and the strike ended.  As a result, multiple qualified

journeyman applicants filed grievances with General Motors for not adhering to the hiring priorities laid out in the national and local agreements. Two qualified applicants were eventually hired on top of the two non-qualified Union member relatives.

The United States prosecuted Douglas and Campbell for violations of the Labor Management Relations Act and the Hobbs Act, claiming that they conspired to demand "things of value" and wrongfully used their labor positions to force General Motors to give jobs to two relatives of Union members. The district court dismissed the indictment as insufficient, but this Court reversed when this same panel found that the indictment sufficiently alleged the charges. Subsequently, Douglas and Campbell proceeded to trial and were convicted. They now appeal, arguing that their convictions are not supported by sufficient evidence. The United States cross-appeals their sentences.

## II.  DISCUSSION

Douglas and Campbell appeal their convictions on several grounds: (1) their actions do not constitute a violation of the Labor Management Relations Act, and the district court's jury instruction regarding the Act was an incorrect statement of the law; (2) violating a labor agreement is not a criminally "wrongful" use of a labor position under the Hobbs Act; and (3) the United States's *Brady* violation at trial warrants a new trial. Additionally, Campbell argues that the district court's jury instruction constructively amended his indictment to include activity not covered by the Labor Management Relations Act.

The United States cross-appeals both sentences, claiming that the district court erred by: (1) using the Blackmail Sentencing Guideline, U.S.S.G. § 2B3.3, rather than the Extortion Sentencing Guideline, U.S.S.G. § 2B3.2; (2) failing to enhance Douglas's and Campbell's total offense level by calculating the loss to General Motors as zero; and (3) varying Douglas's sentence downward to match a departure that Campbell received due to his lung cancer.

**A.        The Labor Management Relations Act**

The Labor Management Relations Act prohibits "any employer . . . to pay, lend, or deliver . . . any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce."   29 U.S.C. § 186(a)(1).  It further forbids anyone to "request, demand, receive, or accept . . . any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a) of this section."  *Id.* § 186(b)(1).  Douglas and Campbell argue that their actions do not fall within the scope of the Act because: (1) they did not demand a "thing of value" for purposes of the Act; and (2) they did not personally receive any "thing of value."  We review both questions of statutory interpretation de novo.  *United States v. Gagnon*, 553 F.3d 1021, 1025 (6th Cir. 2009).  Douglas and Campbell also claim that the district court incorrectly instructed the jury as to section 186(b)(1).  We review de novo this claim as well.  *H.C. Smith Invs., L.L.C. v. Outboard Marine Co.*, 377 F.3d 645, 650 (6th Cir. 2004) (citing *Fisher v. Ford Motor Co.*, 224 F.3d 570, 576 (6th Cir. 2000)).  Lastly, we review constructive amendment claims de novo also.  *United States v. Budd*, 496 F.3d 517, 528 (6th Cir. 2007).

**1.        Thing of Value**

Douglas and Campbell protest that the word "other" in the phrase "money or other thing of value" constrains "thing of value" to things of *monetary* value.  They also invoke *ejusdem generis*, a principle of statutory interpretation providing that, "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Wash. State Dept. of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384-85 (2003).  But that rule applies to "list[s] of specific items separated by commas and followed by a general or collective term," not to a "phrase [that] is disjunctive, with one specific and one general category."  *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008) (refusing to apply the canon to the phrase "any officer of customs or excise or any other law enforcement officer").  The interpretive canon *noscitur a sociis* ("a word is known by the company it keeps") is also

inapplicable when the statute provides few other analogous terms. *Id.* at 226. Additionally, "[t]he rule [of lenity] does not apply when a statute is unambiguous or when invoked to engraft an illogical requirement to its text." *Salinas v. United States*, 522 U.S. 52, 66 (1997). And the name of the section, "[r]estrictions on financial transactions," should not trump the plain meaning of the statutory text.

"[A] fundamental canon of statutory construction is that 'when interpreting statutes, the language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear.'" *Thompson v. Greenwood*, 507 F.3d 416, 419 (6th Cir. 2007) (quoting *United States v. Boucha*, 236 F.3d 768, 774 (6th Cir. 2001)). Douglas's and Campbell's position is contrary to the plain language of the statute. The statute's scope is not limited to only monetary items. Truly, of all the things in this world widely regarded as valuable, money and the like comprise only a small percentage. In the midst of the world's current financial struggles, when the unemployment rate in this country fluctuates between nine and ten percent, it is somewhat laughable to argue that Douglas and Campbell did not demand a "thing of value" when they demanded high-paying jobs for their cronies. The value of a job, especially one that pays $150,000 per year, is undeniable. In this case, the jobs demanded were things of value.

### 2.     Third party beneficiaries

Douglas and Campbell argue that they could not have violated section 186(b)(1) because they themselves never received a "thing of value," but plainly, this is not a requirement of the statute. Although section 186(b)(1) outlaws receiving or accepting things of value, it outlaws requesting or demanding them in the same statutory breath. The plain language of the statute applies to demanding things of value, even if they are intended for, and eventually go to, a third party.

Furthermore, we find agreement from our sister circuits. In *United States v. DeBrouse*, 652 F.2d 383, 387 (4th Cir. 1981), the defendant, president of Teamsters Local 639, demanded that an employer pay $200 each week to a third party. The Fourth Circuit held that the defendant received "the precise thing of value [he] demanded, that

is, payment of $200 a week to [the third party].  Therefore, the fact that the thing of value . . . took the form of payments to [a third party] does not place the transaction beyond the scope of the Act."  *Id.* at 388.  The court in *DeBrouse* also pointed out that Congress exempted a number of types of transactions from the Act, but it did not exempt payments to third party beneficiaries. *Id.*  Additionally, in *United States v. Carlock*, 806 F.2d 535, 555 (5th Cir. 1986), the Fifth Circuit adopted the third party beneficiary theory in *DeBrouse*.

Accordingly, Douglas and Campbell violated section 186(b)(1) by demanding a thing of value for third party beneficiaries.

### 3.     Constructive amendment

Campbell contends that the jury instructions constructively amended the indictment by permitting the jury to convict on the basis of an uncharged third-party-beneficiary theory.  We have explained that jury instructions constructively amend an indictment when they "modify essential elements of the offense charged [so] that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged in the indictment." *Budd*, 496 F.3d at 521 (internal quotation marks omitted).

In this case, the jury instructions did not constructively amend the indictment. The indictment alleges that the defendants "unlawfully . . . demand[ed] . . . the payment . . . of money and things of value in excess of $1,000.00 from General Motors, to wit: [1] the skilled trades and/or journeyman designation . . . and [2] employment under that designation with associated *wages and benefits for Gordon Campbell and Todd Fante*, whom the defendants knew were not qualified."  (emphasis added).  The indictment clearly put Douglas and Campbell on notice that the United States intended to proceed based upon a third-party-beneficiary theory.  Jury instructions to that effect, then, did not constructively amend the indictment.

**B.     The Hobbs Act**

Douglas and Campbell argue that their actions cannot form the basis for criminal liability and be "wrongful" under the Hobbs Act, 18 U.S.C. § 1951(b)(2), merely because the actions violated a collective-bargaining agreement between General Motors and the Union. *United States v. Enmons*, 410 U.S. 396, 401, 408 (1973), clarified that a "wrongful" purpose is one "that the union officials had no legitimate right to demand." While the defendants brief this point at length, this panel's prior decision in this case forecloses any argument about the legal standard:

> The defendants' demands, as alleged by the United States, are illegitimate, as they were in *Cusmano* and *Russo*, and constitute extortion *because they were in contradiction of the collective bargaining agreement and the union's Constitution*. Like the unlawful agreement at issue in *Cusmano*, the "skilled trades proposal" allegedly was obtained outside the traditional labor/management bargaining context. Also, the proposal, as alleged, contradicted a contractual provision between the union and the employers that gave preference to qualified, eligible employees of Pontiac in the distribution of skilled trade jobs and required at a minimum that those who are hired meet specific standards. We conclude that this is one of those instances, referenced by the Supreme Court in *Enmons*, to which the Hobbs Act would apply.

*Douglas*, 398 F.3d at 415 (emphasis added).

The only remaining question is whether the evidence at trial proved what the indictment asserted. We review "the evidence in the light most favorable to the prosecution" and ask whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Under this standard, the evidence sufficed. The evidence demonstrated that Douglas and Campbell had a purpose that violated the National Agreement—forcing General Motors to hire two people who were not qualified and did not have preference under the National Agreement. Even though labor negotiations were ongoing at the time, Douglas's and Campbell's demand that General Motors violate the National Agreement was an action "outside the traditional labor/management bargaining context"

because they demanded something to which they had no legitimate right. The fact that other new positions were created does not alter our conclusion.

Accordingly, Douglas's and Campbell's actions fell within the Hobbs Act's definition of wrongful.

## C.    *Brady* **Violation**

Douglas and Campbell claim that the United States violated *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to disclose to them the conviction of one of their witnesses, Mark Hawkins. "[T]here is some confusion in this circuit with respect to the appropriate standard of review to apply to the denial of a motion for a new trial based on *Brady* violations." *United States v. Heriot*, 496 F.3d 601, 605 (6th Cir. 2007) (documenting both de novo and abuse-of-discretion review, as well as one attempt to reconcile the two standards). However, we are not forced to decide between the two standards because our decision is clear even under the less deferential de novo standard.

*Brady* violations have three elements: "[1] [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). To establish prejudice, "the nondisclosure [must have been] so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Id.* at 282.

In 1988, approximately eighteen years before Douglas's and Campbell's trial, Hawkins pleaded guilty to attempted receipt or concealment of a stolen "pleasure boat" and "outboard motor" valued over one hundred dollars. He served thirty days in jail. Douglas and Campbell claim that they learned of the conviction only after the case had been submitted to the jury. The district court denied their motion for a new trial because the evidence of Hawkins's prior conviction was "immaterial." The crime occurred eighteen years before trial and eight years before the conduct for which the defendants were convicted. Moreover, Hawkins's testimony "consisted primarily of general

background information on union matters, and any statements he made regarding Defendants' actions were corroborated by other witnesses."

The record bears out the district court's assessment.  While Douglas and Campbell mention several matters about which Hawkins testified, they only point to one fact about which no other witness testified—that Douglas and Campbell protracted negotiations for the 1995 Validation Center move.  Even assuming that they are correct, that fact was in no way essential to either conviction.  Therefore, Hawkins's testimony was not prejudicial, and Douglas's and Campbell's *Brady* claim fails.

**D.      Sentencing**

The Probation Office's Presentence Reports calculated both Douglas's and Campbell's sentences using United States Sentencing Guideline section 2B3.3 for Blackmail and Similar Forms of Extortion, which provides a base offense level of nine. It added four points for a loss to General Motors exceeding \$20,000 according to sections 2B3.3(b)(1) and 2F1.1(b)(1)(E), and two points for abuse of trust according to section 3B1.3.  The resulting total offense level was fifteen.  Both Douglas and Campbell had a criminal history category of I, yielding an advisory sentencing range of one and a half years to two years of imprisonment.  The United States objected to the use of section 2B3.3 and argued instead for section 2B3.2.  It also argued for a higher amount of loss, while Douglas and Campbell claimed that General Motors had lost nothing.

The district court sentenced both defendants according to section 2B3.3 and did not impose a loss enhancement.  With an offense level of eleven, the resulting sentencing range was eight months to one year and two months of imprisonment.  Because Campbell had lung cancer, the district court reduced his offense level by three.  This resulted in a sentencing range of zero to six months of imprisonment.  The court sentenced Campbell to no imprisonment, two years of probation including six months of house arrest, and a \$4,000 fine.  The district court found that the section 3553(a) factors pointed toward "the same conclusion" for Douglas, reduced his total offense level by three, and imposed on Douglas the same sentence that Campbell had received.  As opposed to Campbell, Douglas was healthy.

We review de novo whether a district court imposed the correct Sentencing Guideline. *United States v. Rivera*, 516 F.3d 500, 502 (6th Cir. 2008). We will reverse a district court's finding of fact as to the loss attributed to a defendant only if it was clearly erroneous. *United States v. Jordan*, 544 F.3d 656, 671 (6th Cir. 2009). However, we review de novo whether those factual findings warranted the district court's application of a certain Guideline. *United States v. Triana*, 468 F.3d 308, 321 (6th Cir. 2006). Finally, we review sentences for abuse of discretion "[r]egardless of whether the sentence imposed is inside or outside the Guidelines range." *United States v. Gall*, 552 U.S. 38, 51 (2007).

### 1.          Using the blackmail versus extortion Guideline

The district court calculated the sentences using section 2B3.3, which governs "blackmail and similar forms of extortion where there clearly is no threat of violence to person or property." U.S.S.G. § 2B3.3 cmt. n.1 (1995). That section defines blackmail as "a threat to disclose a violation of United States law unless money or some other item of value is given." *Id.* The United States believes this choice was in error because section 2B3.2, "Extortion by Force or Threat of Injury or Serious Damage," better captures Douglas's and Campbell's conduct. *Id.* § 2B3.2. Section 2B3.2 applies when defendants make a threat:

> that reasonably could be interpreted as one to injure a person or physically damage property, *or any comparably serious threat,* such as to drive an enterprise out of business. Even if the threat does not in itself imply violence, the possibility of violence or serious adverse consequences may be inferred from the circumstances of the threat or the reputation of the person making it. An ambiguous threat, such as "pay up or else," or *a threat to cause labor problem*s*, ordinarily should be treated under this section*.

*Id.* § 2B3.2 cmt. n.2 (emphasis added). "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline."

*Stinson v. United States*, 508 U.S. 36, 38 (1993).[1]  Section 2B3.2 sets a base offense level of eighteen, which is twice the level of the blackmail Guideline in section 2B3.3.

The district court erred in applying section 2B3.3 and should have applied section 2B3.2.  The difference between the two sections is the type of action threatened. Section 2B3.3 contemplates blackmail, which is defined as threatening to reveal a violation of federal law unless money or some other item of value is given, and similar threats.  These types of threats involve making public an established fact; revealing that which already exists.  In a sense, the victim of blackmail created the possibility for his injury.  Quite differently, section 2B3.2 contemplates extortion by force or threat of injury or *serious damage*.  These types of threats involve attacks upon more "innocent" victims who have in no way brought upon themselves any harm.  Furthermore, both sections contemplate that a threat is covered by one or the other, not both.  *See* U.S.S.G. § 2B3.3(c)(2) ("If the offense involved extortion by force or threat of injury or serious damage, apply § 2B3.2.").

Douglas and Campbell argue that the threat did not rise to the serious levels explained in section 2B3.2 because the threatened action would not have driven General Motors out of business.  However, even assuming that an on-going strike would not have terminated General Motors entirely, that assertion ignores that the Pontiac plant might have been crippled or ruined.  *Cf. United States v. Williams*, 952 F.2d 1504 (6th Cir. 1991) (holding that section 2B3.2 applied where defendant threatened to thwart rezoning of only *one* of real estate company's projects, which would have ruined the project and not the company as a whole); *United States v. Boggi*, 74 F.3d 470, 477 (3d Cir. 1996) (holding that section 2B3.2 could apply where defendant made "threats of labor strikes and labor unrest that would result in economic injury, or ruin, for a given project" run by a real estate developer).

As the state of Michigan has sadly witnessed time and time again, large automotive manufacturers will close and consolidate plants if necessary, especially if

---

[1]*Stinson* is still good law after *Booker*.  *See, e.g.*, *United States v. Lay*, 583 F.3d 436, 446 (6th Cir. 2009) ("The Commentary is 'authoritative.'" (quoting *Stinson*, 508 U.S. at 38)).

doing so will result in more favorable labor conditions. Here, Douglas and Campbell threatened to prolong an already lengthy and costly strike. Even though General Motors is a multi-billion dollar company, its total worth is spread across many plants. Each day of the strike cost the Pontiac plant millions of dollars. Having lost millions of dollars each day for eighty-seven consecutive days, and facing an indefinite continuance of the strike, General Motors was threatened with undeniably grievous damages. This threat falls comfortably in line with the language in section 2B3.2, which covers serious threats to cause labor problems. In fact, the district court even admitted during Campbell's sentencing hearing that no blackmail had occurred in this case. Upon remand, the district court should apply section 2B3.2.

### 2.        The loss to General Motors

The Probation Office proposed that General Motors suffered a loss of $30,474.76 as a result of complying with Douglas's and Campbell's threat, and accordingly proposed a four-level enhancement to Douglas's and Campbell's offense levels. It measured the loss according to the salaries that General Motors paid to the unqualified relatives *before* GM "evaluated and retained" those men "based on their work performance." The United States, Douglas, and Campbell all objected to this recommendation. The district court rejected the loss enhancement entirely because the relatives performed their jobs well and caused General Motors no "workplace loss." In other words, General Motors obtained valuable services in exchange for the salaries that it paid. The United States appeals the loss determination.

First, the parties disagree about whether "workplace loss" is a meaningful measure in an extortion case. Douglas and Campbell cite many older cases in which courts concluded that the value of fraudulently provided services offset any loss for purposes of loss calculation. *See, e.g.*, *United States v. Maurello*, 76 F.3d 1304, 1311-12 (3d Cir. 1996) ("A client who obtains a satisfactory contract, settlement, or verdict has received something of value, irrespective of whether the lawyer was licensed at the time."). The United States distinguishes fraudulent services from the services provided in this case because "GM did not ask for these services; rather, it was forced to create

two new positions" for people who were not qualified as journeymen.  According to the record, General Motors might not have hired the unqualified relatives were it not for the threat, but the company would have filled these positions with other applicants regardless.  Furthermore, based on General Motors's choice to retain the employees, we can only assume that they performed satisfactorily and General Motors "got its money's worth."  Therefore, the district court's finding that General Motors did not suffer any direct loss by hiring and paying the relatives is not clearly erroneous.

Second, the district court did not consider General Motors's consequential losses.  Section 2B3.2 expressly anticipates consequential losses, *see* U.S.S.G. § 2B3.2 cmt. 5, but consequential losses are irrelevant under section 2B3.3, which looks only at "the greater of the amount obtained or demanded," U.S.S.G. § 2B3.3(b)(1).  Because we conclude that the district court should have applied section 2B3.2, the district court should have also determined whether General Motors suffered any consequential losses.

Here, when General Motors hired the non-qualified relatives, they violated the hiring priorities set forth in the national and local Union agreements.  As a result, multiple qualified Union members filed grievances because they should have had higher priority.  General Motors had to pay $450,000 in legal fees, plus salaries and expenses for in-house counsel, and the salaries for two Union members who were hired as journeymen as a way to settle their grievances.  The district court did not make a factual finding as to consequential damages.  Therefore, on remand, the district court must calculate consequential damages to General Motors according to section 2B3.2(b)(2), and apply the appropriate offense level enhancement.

### 3.     Downward variance in Douglas's sentence

While the district court's use of the incorrect Guidelines section requires that we remand this matter for resentencing, the United States additionally claims that Douglas's sentence is substantively unreasonable because the district court relied upon an improper factor—the disparity between Douglas's and Campbell's sentences.  Pursuant to section 5H1.4, Campbell received a downward departure equivalent to three offense levels because he had lung cancer.  Although Douglas was not ill, the district court reduced his

offense level by the same amount to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct."

Sentencing decisions must be both procedurally and substantively reasonable. *Gall*, 552 U.S. at 51. Here, we need not address the substantive reasonableness of Douglas's sentence because it was procedurally unreasonable on two separate grounds. First, as we have already explained, the district court improperly applied the blackmail Guideline, resulting in a lower offense level and sentencing range. *Cf. United States v. Rosenbaum*, 585 F.3d 259, 265 (6th Cir. 2009) ("A sentencing court commits procedural error by failing to calculate (or improperly calculating) the Guidelines range . . . ."). Second, the district court reduced Douglas's offense level by three points without an applicable section of the Guidelines to support the reduction. *Cf. United States v. Goodman*, 519 F.3d 310, 323 (6th Cir. 2008). The court admitted that "no departure [was] actually available," but reduced Douglas's offense level nevertheless so that it could give him a within-Guidelines sentence that was the same as Campbell's. When determining whether to vary downward from a properly calculated sentencing range, a district court may consider the sentencing disparity between co-defendants. *See United States v. Presley*, 547 F.3d 625, 631-32 (6th Cir. 2008) (explaining that district courts may consider sentencing disparities between co-defendants if they so wish). However, reducing a defendant's offense level is a different animal entirely. It requires an applicable Guideline section, and here, while the disparity may have supported a downward variance, it did not support a reduction in Douglas's offense level.

### III. CONCLUSION

Douglas and Campbell violated section 186(b) of the Labor Management Relations Act by threatening to lengthen a labor strike if jobs—things of value—were not given to two unqualified relatives of Union members—third party beneficiaries. Furthermore, because this action flew in the face of the national and local Union agreements, it was wrongful pursuant to the Hobbs Act. Accordingly, we **AFFIRM** Douglas's and Campbell's convictions, but we **REMAND** for resentencing in accordance with this opinion.