NOT RECOMMENDED FOR PUBLICATION
File Name: 12a0666n.06

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jun 21, 2012*

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE NORTHERN |
| GERALD TAYLOR (07-3975/10-4065), | ) | DISTRICT OF OHIO |
| MAURION LEWIS (07-4028/10-4062), and | ) | |
| CARL HENDERSON (07-3994/10-4063), | ) | OPINION |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

**Before:   COLE, GILMAN, and WHITE, Circuit Judges.**

**RONALD LEE GILMAN, Circuit Judge.**  Carl Henderson, Maurion Lewis, and Gerald

Taylor were each convicted of conspiring to distribute phencyclidine (PCP).  Lewis and Taylor were

tried together and, in addition to the conspiracy conviction, were convicted of possessing PCP with

the intent to distribute the drug.  Henderson, tried separately, was found not guilty on the PCP-

possession charge, but was convicted of being a felon in possession of ammunition in addition to the

conspiracy conviction.

On appeal, each defendant challenges his convictions on several grounds.  All three

defendants claim that the district court erred in failing to suppress certain incriminating evidence in

their respective trials.  Henderson and Taylor also challenge the sufficiency of the evidence to sustain

their PCP-related convictions.  Finally, all three defendants contend that they should be given new

trials because the government failed to disclose impeachment evidence against Drug Enforcement

Agency (DEA) Special Agent Lee Lucas, a key witness against them. For the reasons set forth

below, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

A.      **Factual background**

Since 2005, a Cleveland-area drug task force—which included local, state, and federal law-

enforcement officers—had suspected Henderson of being part of a large PCP-distribution ring that

transported the drug from California to Ohio. On January 4, 2007, Rocky River Police Department

Officer Tracy Hill discovered that Henderson had registered with a Los Angeles address at the

Extended Stay America hotel in Brooklyn, Ohio even though he lived with his wife, Tekora Madden,

in their nearby suburban-Cleveland home and had a phone number with a Cleveland area code.

Henderson had paid cash for his stay at the hotel, which began on December 29, 2006 and ended on

January 4, 2007. A search of the hotel's records showed that he had paid for a room at the hotel on

many other occasions since December 2003.

Upon returning to the police station, Officer Hill ran a background check on Henderson,

which revealed that Henderson had an active felony arrest warrant against him for carrying a

concealed weapon. Officer Hill notified other task-force officers, including DEA Special Agents

Lee Lucas and Shaun Moses, and asked his source at the Extended Stay America hotel to notify him

if Henderson returned. On January 11, 2007, the source alerted Officer Hill that Henderson had just

walked into the hotel in the area of Rooms 104 and 106.

After checking the hotel registry, Officer Hill discovered that a man named Maurion Lewis from California had been staying in Room 106 since January 5, 2007 and had paid in cash. The registry also showed that two people were staying in the room. Although Officer Hill had never heard of Lewis, he surmised that Henderson had visited that room, rather than Room 104, because of the California connection and the fact that Lewis had paid for his hotel stay in cash.

Officer Hill contacted Agents Lucas and Moses, as well as other task-force members, and they immediately set up surveillance at the hotel. Several officers, including Officer Hill, checked into Room 103 to maintain a watch on Room 106, which was directly across the hall. Other officers conducted surveillance in the hotel parking lot to check for any suspicious activity. From Room 103, Officer Hill could see the parking lot behind the hotel. The first thing he noticed in the parking lot was a silver minivan backed into a spot next to the hotel's side exit with its lights on and a black man, later identified as Gerald Taylor, sitting in the driver's seat. Taylor is approximately five-feet, eight-inches tall and weighs around 165 pounds.

Shortly thereafter, Agent Moses joined Officer Hill in Room 103, and they both witnessed Taylor leave the minivan and walk towards the side entrance of the hotel, which required a hotel keycard to enter. They then observed Henderson walking from that same area on the side of the hotel to a green minivan, which was driven by Madden, Henderson's wife. As soon as Henderson entered the passenger's side of the vehicle, Madden drove off. A set of officers, including Agent Lucas, followed them in unmarked vehicles, while Officer Hill, Agent Moses, and Independence, Ohio Police Department Officer Randy Wilson remained in Room 103 to monitor Room 106 and the silver minivan, which remained parked in the hotel lot.

Soon thereafter, Officer Hill heard the door to Room 106 open and close twice. After the first sound of the door opening, Officer Wilson observed a black man quite a bit larger than Taylor leave the room and head towards the side exit. That man was later identified as Maurion Lewis, who is approximately six-feet, two-inches tall and weighs between 240 and 250 pounds. When Officer Wilson turned around to tell Officer Hill and Agent Moses, the door to Room 106 opened a second time. Officer Wilson was unable to see who exited. Seconds later, however, the officers saw Lewis and Taylor walk together from the side exit and climb into the silver minivan. Taylor drove while Lewis sat in the front passenger's seat. Agent Moses and Officer Wilson got into their own unmarked vehicles and followed the silver minivan.

### 1. *Pursuit and stop of Henderson and Madden in the green minivan*

Agent Lucas led the pursuit of the green minivan containing Henderson and Madden. Other task-force officers followed, including Cleveland Police Department Captain Brian Heffernan and Detective Timothy Clark. Agent Lucas authorized a stop of the minivan based on Henderson's outstanding arrest warrant, but he requested that uniformed local officers in marked vehicles initiate the stop. What happened next is detailed in the following excerpts from two of the district court's opinions:

> Once the marked police patrol units stopped the minivan, Lucas left the Madden-Henderson surveillance to participate in the Lewis-Taylor surveillance back at the Extended Stay America motel.
>
> Upon stopping the Madden-Henderson minivan, the police noticed that the vehicle's interior smelled of marijuana and they questioned Henderson and Madden as to Henderson's identity. Lucas testified that, when asked to identify himself at the roadside stop, Henderson presented the police with [a false Social Security card and birth certificate] showing his name as [either "Jason Gerode Moon," "Shawn Moon," or] "Keisoun Moon." Madden identified Henderson as her husband and said his

name was "Shawn." Special Agent Lucas testified that Henderson used the name "Shawn" as a nickname. When questioned about her passenger's full identity, Madden refused to provide Henderson's last name.

Heffernan was on the scene and, based on information from Lucas, knew Madden's passenger to be "Carl Henderson." Detective Clark, based on his personal knowledge, identified Madden's "Shawn" . . . as "Carl Henderson." In short order, the police arrested Henderson and transported him to Cleveland's Central Prison Unit [a city jail].

Separately, Captain Heffernan ordered Madden out of the minivan and placed her in the back seat of his undercover police car. Heffernan and Clark retrieved Madden's purse and day-planner from the minivan and counted approximately $1[4],000 in cash and [$3,000 in] checks that the officers said smelled like marijuana.

For approximately the next two hours, Madden sat in the back seat of the police car while Heffernan and Clark questioned her about the approximately $17,000 and her connection with Henderson. Upon orders from Lucas, Madden "was not free to go" from the officers' custody from the time of her roadside stop or thereafter.

. . . . The officers found no drugs or weapons in the minivan or on Madden's person.

Upon instruction by Lucas, Heffernan and Clark continued to detain and question Madden in the police car. Heffernan confiscated Madden's cell phone. Heffernan and Clark phoned Lucas as they received information from Madden. In turn, Lucas periodically contacted the prosecuting attorney to discuss next steps in the on-going PCP investigation.

*United States v. Madden*, No. 1:07-CR-68, 2007 WL 1115184, at *1-2 (N.D. Ohio Apr. 13, 2007)

(unpublished opinion) (footnote and citations omitted).

Over the afternoon and evening of January 11, 2007, the police sought Madden's consent to search the Wynde Tree Residence [Henderson and Madden's home]. Madden initially refused, but finally agreed to allow the police to search her home. Madden told police that they would find cash and marijuana belonging to Henderson in the house.

At approximately 9:00 p.m., Madden accompanied the officers to the Wynde Tree Residence. At the home, the police found one Listerine bottle that apparently contained PCP, two bricks of marijuana, cash, other contraband, and several karaoke boxes with mailing labels addressed to "Kim." The police confiscated the drugs, money, a "gun box w/ gun accessories [and] (6) six live 9mm rounds" and other contraband. Special Agent Lucas then "formally" arrested Madden.

Upon concluding the search of the Wynde Tree Residence, Lucas and [another agent] went directly to the Cleveland jail to interview Henderson. Lucas conducted Henderson's interview. . . . Lucas testified that Henderson never asked to speak with an attorney during the interview; Henderson testified that he requested a lawyer during the interview.

Lucas began the interview by advising Henderson of his Miranda rights and having him sign a Cleveland police rights waiver form. Lucas then told Henderson that the police had just completed a search of the Wynde Tree Residence in which they found, among other things, PCP, marijuana, and cash. Henderson denied that the house contained PCP, but took responsibility for the marijuana and cash. Henderson also denied that Madden had any involvement with any potentially illicit activity involving Taylor and Lewis. As part of the interview, Henderson and Lucas also discussed Henderson's involvement with Taylor and Lewis. Henderson then wrote a statement in which he took responsibility for "the weed & money that was found in the house and the stuff behind the chair." Henderson's entire written statement reads as follows:

> I leave [sic] at 2350 Wyndy [sic] Tree with my wife and kid Tekora Made [sic] and the weed & money that was found in the house and the stuff behind the chair belong [sic] to me. I had the boxes sent to 3555 E 153 St, and she came to pick me up from to [sic] motel she never came in she just picked me up. The boxes I'm talking about I you [sic] for the money. I let a friend of mine yoused [sic] my van. My wife don't know them.

The next day, Special Agent Lucas prepared a report of the investigation in which he described Henderson as arrested for "Federal Drug Violations" regarding his role in a PCP Distribution Organization.[] In part, Lucas's report reads as follows:

> HENDERSON stated that he resided at 2350 Wynde Tree Drive, Seven Hills, Ohio, with his wife, Tekora MADDEN and their daughter. HENDERSON claimed ownership of the marijuana, money, and Listerine bottle found in the residence. HENDERSON stated that the contents of the Listerine bottle[] was not PCP. HENDERSON admitted that he had several music machines at his residence, so that he could hide the money he made from selling marijuana in them. HENDERSON stated that he had the machines mailed to another address, because he didn't want anyone to know where he lived. HENDERSON was asked who KIM was, because that is the name the boxes were addressed to. HENDERSON stated that "KIM" was a made up name he used to send the boxes to.

-6-

> HENDERSON stated that he had MADDEN drive him around, because he had a warrant on a gun case, and didn't want [sic] pulled over.

Special Agent Lucas's report also described what Henderson had told him about his relationship with Taylor and Lewis:

> HENDERSON state[d] that he had met with TAYLOR and LEWIS at the hotel, but that MADDEN had waited in the car. HENDERSON admitted that he had loaned his minivan to TAYLOR and LEWIS. HENDERSON further stated that LEWIS and TAYLOR were active members of the NUTTY BLOC[C] CRIPS gang, but that he (HENDERSON) was a non-active member of the gang.

*United States v. Henderson*, No. 1:07-CR-68, 2007 WL 1115195, at *1-3 (N.D. Ohio Apr. 13, 2007) (unpublished opinion) (brackets containing "sic" in original; other brackets added) (citations omitted).

### 2. *Pursuit and stop of Lewis and Taylor in the silver minivan*

After leaving the team that stopped Henderson and Madden, Agent Lucas joined Agent Moses, Officer Wilson, and the other task-force officers following the silver minivan. What happened next is detailed in the following excerpt from the district court's opinion denying Lewis's and Taylor's pretrial motions to suppress:

> The Taylor-Lewis undercover team followed the silver van as it exited the motel's parking lot and entered onto Interstate 480. Once on the interstate, Taylor engaged in counter-surveillance driving techniques, including dramatic speed and lane changes. During the undercover officers' roving surveillance, Officer Wilson ran the ownership information for the van and found that it belonged to Henderson.
> Eventually, Taylor exited Interstate 480 at Twinsburg and pulled into the parking lot of a Wendy's restaurant. Taylor backed the van into a parking space far from the restaurant's entrance. Special Agent Lucas entered the Wendy's parking lot, got out of his car, and went into the restaurant where he observed Taylor and Lewis sitting in the silver van and smoking what he believed to be marijuana.

*United States v. Taylor*, No. 1:07-CR-68, 2007 WL 1115194, at *1 (N.D. Ohio Apr. 13, 2007)

(unpublished opinion) (citations omitted).

Another member of the task force, Special Agent Thomas Verhiley of the Ohio Bureau of

Criminal Identification and Investigations, then joined the team conducting surveillance of the silver

minivan. He pulled his vehicle into the Wendy's parking lot soon after the silver minivan parked

there. As he drove by, Agent Verhiley similarly noticed that the two men in the van were smoking

what he believed to be marijuana based on the way they were passing the cigarette back and forth.

The district court described what happened next:

> After approximately thirty minutes, Taylor pulled through the Wendy's drive-through
> and then traveled back onto Interstate 480 in the direction of Cleveland. Special
> Agents Lucas and Verhiley followed the silver van onto the interstate, where Taylor
> again engaged in counter-surveillance driving maneuvers.
>
> Eventually, Taylor exited the highway and pulled into the parking area of a
> Marathon gas station in Maple Heights, Ohio. The officers intercepted the van in the
> parking lot, removing both Taylor and Lewis from the vehicle and searched the van.
> The officers based the investigatory stop on Taylor's many traffic violations, the fact
> that Taylor and Lewis appeared to have been smoking marijuana while driving and
> at the Wendy's restaurant, and Taylor's and Lewis's suspected connection to
> Henderson's drug trafficking activities.
>
> During the search of the van, Special Agent Lucas found a small amount of
> marijuana in the van's front console. The officers also found an electronic room key
> in Lewis's pocket, which they confiscated and later learned corresponded to Room
> 106 of the Extended Stay America motel in Brooklyn, Ohio. Special Agent Lucas
> advised Taylor and Lewis of their *Miranda* rights. Officers then questioned the men
> and learned that they were from California, staying at the Extended Stay America
> motel, and knew Henderson.

*Id.* at *1-2 (citations omitted).

Lewis also told the officers that Taylor was in town to see Madden and that she had given

them the silver minivan. Following the arrests of Lewis and Taylor, Agent Moses then applied to

the Cuyahoga County Court of Common Pleas for a search warrant for Room 106. The district court

summarized the affidavit supporting the warrant as follows:

> In his affidavit accompanying the request for a search warrant, Special Agent
> Moses set forth historical information received from five confidential informants.
> The informants provided information as to drug trafficking activities undertaken by
> Henderson starting in 2003 through January 11, 2007. The informants told the police
> that Henderson had entered either Room 104 or 106 at the Extended Stay America[]
> motel at a time when Lewis occupied Room 106. In the affidavit, Special Agent
> Moses described the arrests of Henderson, Madden, Lewis, and Taylor, as well as the
> police search of Madden's residence where officers found several ounces of
> suspected PCP, two pounds of suspected marijuana, and a large amount of currency.
> The Cuyahoga County Court issued a search warrant for Room 106 of the Extended
> Stay America motel in Brooklyn, Ohio.

*Id.* at *2 (citations omitted).

When the officers entered Room 106 to conduct the authorized search, the room was filled

with the "overwhelming" chemical odor of PCP, and they discovered an open water bottle containing

PCP in the sink. Seven one-liter Listerine bottles filled with PCP and vacuum-sealed in freezer bags

were uncovered from a large backpack lying on the floor. The officers also seized $6,000 in cash

hidden inside a sock and an itinerary in Lewis's name for a flight from Los Angeles to Cleveland on

January 5, 2007, both located in one or the other of two suitcases found in the room.

After concluding their search, the task-force officers left the two suitcases behind, but were

later notified that the luggage had been recovered by the hotel staff and could be picked up by the

officers. An officer returned to the hotel on January 24, 2007 and took possession of the two

suitcases. Each suitcase had a different size of men's clothing that corresponded to the respective

sizes of Lewis and Taylor.

-9-

Subpoenaed flight records showed—and a ticket found in the pocket of one of the suitcases confirmed—that Taylor had bought a ticket on January 5, 2007 to fly from Los Angeles to Cleveland on January 6, 2007, a day after Lewis arrived. Continental Airlines records further showed that Lewis and Taylor had previously flown to together to Cleveland from Los Angeles on December 17, 2006, returning on December 21, 2006. A check of hotel records by Officer Hill revealed that a "Jason" Taylor (Gerald's middle name is Jason) had previously been registered at the Extended Stay America hotel from December 18 to December 20, 2006.

**B.       Procedural background**

Following their arrests, Henderson, Lewis, and Taylor, along with Henderson's wife Madden, were indicted as participants in a conspiracy to distribute at least one kilogram of PCP, in violation of 21 U.S.C. §§ 841 and 846, and on other related charges. All the defendants moved to suppress certain incriminating evidence. Three days of suppression-hearing proceedings were held in March 2007.

**1.       *Motions to suppress***

During those proceedings, task-force officers acknowledged that they had detained Madden in the back of Captain Heffernan's vehicle and had persuaded her to consent to a search of the home that she shared with Henderson. While detained, she also made statements implicating Henderson in the PCP conspiracy. Madden moved to suppress those statements and any evidence seized during the search of her home on the basis that her detention in the back seat was an arrest that lacked probable cause.

The district court agreed that Madden had, for all intents and purposes, been illegally arrested when she was put into the back of Captain Heffernan's car. Although the officers had a warrant for Henderson's arrest, no similar warrant existed for Madden and, in the court's judgment, no probable cause existed to effectuate her arrest. The court consequently ruled that it would "not allow the Government to present evidence gathered after Captain Heffernan put Madden in the back seat of his police car." *Madden*, 2007 WL 1115184, at *14. This included all of Madden's incriminating statements as well as the PCP, marijuana, cash, and gun box found in the search of Madden and Henderson's home. The government, with little admissible evidence against Madden, subsequently dismissed all charges against her.

Henderson separately moved to suppress all the evidence seized from his home and the green minivan, all the statements made to the officers while he was detained in the city jail immediately following his arrest, and all the statements he made following the search of his home. The district court ruled that because of Henderson's privacy interest in the home he shared with Madden, and in light of its earlier ruling that the search of their home was unconstitutional, all evidence discovered during that search was inadmissible against Henderson. In addition, the court concluded that Henderson's statements regarding the contraband found at his home must be excluded as "fruits of the poisonous tree."

On the other hand, the district court determined that Henderson's statements regarding his involvement with Lewis and Taylor were "distinct and unrelated" to Henderson's statements regarding the contraband found in his home. *Henderson*, 2007 WL 1115195, at *6. These Lewis-

and-Taylor-related statements were therefore not deemed fruits of the illegal search and were admissible against Henderson.

Meanwhile, Lewis and Taylor both moved to suppress all evidence seized during the search of Room 106 in the Extended Stay America hotel. Lewis argued that the affidavit in support of the search warrant issued for Room 106 lacked probable cause to believe that contraband would be found in the room. Taylor asserted that the search warrant should be voided because the affidavit in support of the warrant did not disclose that four of the five confidential informants cited were in custody and attempting to reduce their own sentences by cooperating. He also moved to suppress all evidence discovered as a result of the initial stop of the silver minivan, as well as his subsequent statements, claiming that the officers lacked both reasonable suspicion to stop the vehicle and probable cause to arrest him. Both motions were denied.

### 2. *Trials, appeals, and motions for new trials*

The government moved to sever Henderson's trial from Lewis and Taylor's so that it could introduce Henderson's out-of-court statements regarding his alleged coconspirators. Those statements, while admissible against Henderson, were inadmissible hearsay against Lewis and Taylor under *Bruton v. United States*, 391 U.S. 123 (1968). To avoid any *Bruton* issue, and to permit the government to use Henderson's statements against him, the district court granted the government's motion to sever the trials.

For a two-day period commencing on April 30, 2007, Lewis and Taylor were tried on the following charges: (1) conspiracy to distribute at least one kilogram of PCP, in violation of 21 U.S.C. §§ 841 and 846; and (2) possession of PCP with the intent to distribute the drug, in

violation of 21 U.S.C. § 841. A jury convicted the two men on both counts, and they received identical sentences of 188 months' imprisonment.

In May 2007, Henderson was tried on three counts: (1) conspiracy to distribute at least one kilogram of PCP, in violation of 21 U.S.C. §§ 841 and 846; (2) possession of PCP with the intent to distribute the drug, in violation of 21 U.S.C. § 841; and (3) possession of ammunition as a felon, in violation of 18 U.S.C. § 922(g)(1). The felon-in-possession charge arose out of a traffic stop that occurred several months before the PCP-related events. At the end of the trial, a jury found Henderson guilty of the conspiracy and possession-of-ammunition charges, but not guilty of possessing PCP with the intent to distribute the drug. He received a total sentence of 270 months' imprisonment.

All three defendants filed timely appeals. In addition, Lewis and Taylor filed motions for a new trial in February 2008 based on newly discovered evidence. They alleged that the government failed to disclose evidence indicating that Agent Lucas had previously made knowingly false statements under oath in other cases, thus violating their rights to due process. Henderson joined their motion in April 2008. Their claims were based on a series of articles published in *The Plain Dealer*, a Cleveland newspaper, from July 2007 to January 2008. These articles revealed that Agent Lucas was under investigation for allegedly lying under oath in other drug cases where his testimony resulted in the convictions of several innocent defendants.

This court stayed the defendants' appeals pending the resolution of their motions for new trials. Discovery relating to the motions ensued for the next year, culminating in July 2009 when the district court held three days of evidentiary proceedings. On August 4, 2010, the court denied

all the defendants' motions for new trials. Each defendant has timely appealed the denial of his new-trial motion, and those appeals have now been consolidated with their earlier appeals.

## II. ANALYSIS

### A. Suppression issues

All three defendants argue that the district court erred in failing to suppress certain evidence against them. When reviewing the district court's denial of a motion to suppress, we construe the evidence in the light most favorable to the government, evaluating the court's factual findings under the clear-error standard and its legal conclusions de novo. *United States v. Gross*, 662 F.3d 393, 398 (6th Cir. 2011) (citations and internal quotation marks omitted).

#### 1. *Henderson's statements regarding Lewis and Taylor*

In Henderson's appeal, he argues that Agent Lucas should have been prevented from testifying about Henderson's statement regarding his connection to Lewis and Taylor because those statements were "fruits of the poisonous tree." "'[T]he indirect fruits of an illegal search or arrest should be suppressed when they bear a sufficiently close relationship to the underlying illegality.'" *Gross*, 662 F.3d at 401 (quoting *New York v. Harris*, 495 U.S. 14, 19 (1990)). At the suppression hearing, Henderson testified that he did *not* make the following statements and that Agent Lucas fabricated them in his written report about the interrogation:

> HENDERSON state[d] that he had met with TAYLOR and LEWIS at the hotel, but that MADDEN had waited in the car. HENDERSON admitted that he had loaned his minivan to TAYLOR and LEWIS. HENDERSON further stated that LEWIS and TAYLOR were active members of the NUTTY BLOC[C] CRIPS gang, but that he (HENDERSON) was a non-active member of the gang.

Henderson admitted at the hearing that he knew Lewis and Taylor and that he spent time with them in California. He also acknowledged that he is a Nutty Blocc Crip but denied everything else that he allegedly said in the statements.

> The district court denied Henderson's motion to suppress, reasoning that

> nothing suggests the presence of Taylor or Lewis at [Henderson's] Residence [and] sufficient evidence independent of reference to the contraband found at the residence supported the warrant authorizing the January 11, 2007 search of Room 106 at the Extended Stay America motel. Further, Henderson received his *Miranda* warning and voluntarily gave statements about Taylor and Lewis.

*Henderson*, 2007 WL 1115195, at *6. On appeal, Henderson asserts that he made the statements at issue as a direct result of the government's illegal seizure of incriminating evidence at his home. He also claims that he made them in order to protect his wife. (Henderson does not explain whether he is now admitting to making the statements or is assuming arguendo that he made them.)

According to Henderson, the district court erred by failing to determine "whether the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstances so as to remove the 'taint' imposed upon the evidence by the original illegality," i.e., the unconstitutional search of Henderson's home. *See Gross*, 662 F.3d at 401 (internal quotation marks omitted) (outlining the steps of the attenuation analysis). "[A]ttenuation analysis," however, "is only appropriate where, as a threshold matter, courts determine that the challenged evidence is in some sense the product of illegal governmental activity." *Harris*, 495 U.S. at 19 (internal quotation marks omitted).

Here, the district court concluded that Henderson's statements regarding Lewis and Taylor lacked a causal connection to the unconstitutional search of Henderson's home. Because this is a

factual finding, we review it under the clear-error standard. *See Gross*, 662 F.3d at 398. Henderson asserts that he knew the contraband found in his home implicated Madden and that he was trying to protect her by taking responsibility for anything that connected her to criminal activity. The only connection between the PCP found in Henderson's home and the PCP found in Room 106, however, was that the PCP in both locations was in "Listerine natural citrus flavor bottle[s]." But Henderson did not admit to any knowledge of the PCP found in his home or in Room 106 in his statement to Agent Lucas.

Henderson's alleged statements about visiting Room 106 and loaning Lewis and Taylor the silver minivan could have arguably been made to protect Madden because Lewis had told the officers that Taylor was visiting Madden and that Madden had loaned them the silver minivan. But if that were the case, then Lewis's remarks, not the illegal search of the home, would have been the impetus for Henderson's attempt to exculpate his wife by admitting that he had a relationship with Lewis and Taylor. The district court therefore did not clearly err in determining that Henderson's statements concerning Lewis and Taylor were independent from those regarding the contraband recovered in the illegal search of his home. Accordingly, we find no error in the court's denial of Henderson's motion to suppress as to his Lewis-and-Taylor-related statements.

### 2.       *Evidence against Lewis and Taylor*

Turning now to Lewis's and Taylor's suppression claims, they both argue that the district court erred in failing to suppress (1) the statements that they gave after they were stopped in the silver minivan, (2) the evidence seized from that minivan, and (3) the evidence seized from Room 106 in the Extended Stay America hotel. They assert that the task-force officers did not have

reasonable suspicion to stop the silver minivan, probable cause to arrest them, or probable cause to obtain a search warrant for Room 106.  These contentions are addressed in turn below.

### a.    Stop of the silver minivan

Lewis and Taylor claim that the statements they made after they were ordered out of the silver minivan should be suppressed because the task-force officers had no basis for the investigatory stop.  "Stopping a vehicle and detaining its occupants amounts to a seizure under the Fourth Amendment." *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000).  But "[t]here is a degree of confusion in this circuit over the legal standard governing traffic stops, and in particular over whether police officers must have reasonable suspicion or probable cause in order to make a valid stop." *United States v. Hughes*, 606 F.3d 311, 316 n.8 (6th Cir. 2010) (internal quotation marks omitted).

"Reasonable suspicion" is a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). On the other hand, "[p]robable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc) (internal quotation marks omitted).  Probable cause exists where circumstances "are sufficient to warrant a prudent person, or one of reasonable caution, in believing . . . that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

Although "virtually every other circuit court of appeals has held that reasonable suspicion suffices to justify an investigatory stop for a traffic violation," *United States v. Simpson*, 520 F.3d

531, 540 (6th Cir. 2008), the Sixth Circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation," *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). But the *Blair* court's recognition of this bifurcated analysis was qualified by a footnote, which stated that the delineation was not actually so clear: "Whether the police may stop a vehicle based on mere reasonable suspicion of a civil traffic violation is the subject of a conflict in our case law. . . . Because we dispose of this case on other grounds, . . . we will not resolve the discrepancy between the probable cause and reasonable suspicion standards." *Id.* at 748 n.2; *see also Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004) (same).

Adding further complexity to this muddle is the decision of this court in *Simpson*, which was issued only a month before *Blair* was decided. The *Simpson* court held that if the police suspected that a violation of the law was "ongoing" (as opposed to "completed"), regardless of whether that violation was criminal or civil in nature, then the stop's constitutionality "is governed by the standard of reasonable suspicion, not probable cause." 520 F.3d at 541.

Here, the district court found that the task-force officers had testified to facts sufficient to raise a reasonable suspicion that Lewis and Taylor were involved in criminal activities and that the officers had probable cause to believe that traffic violations had occurred. We will assume without deciding that the less-deferential probable-cause standard is the appropriate one to apply to the traffic-violation justification because we conclude that probable cause indeed existed. Specifically, Agents Lucas and Verhiley testified that Taylor, who was driving, had violated several traffic laws

by speeding and abruptly crossing lanes to make turns in an apparent attempt to lose the vehicles that were following the minivan.

In addition, the task-force officers had reasonable suspicion of criminal activity based on the testimony of Agents Lucas and Verhiley. Both agents recounted that they witnessed Lewis and Taylor smoking what the agents reasonably believed to be marijuana in the minivan while it was parked at a Wendy's restaurant. This belief was based on the way Lewis and Taylor held the cigarette, passed it back and forth, and inhaled the smoke.

Both events—Taylor's erratic driving and the apparent smoking of marijuana at Wendy's—are sufficient to justify an investigatory stop of the minivan. We thus find no error in the district court's conclusion that the investigatory stop of the silver minivan was constitutional.

### b. *Arrests of Lewis and Taylor and the subsequent search of the minivan*

Lewis and Taylor further argue that the task-force officers lacked probable cause to arrest them and search the silver minivan. "[I]n order to arrest the person or to conduct a subsequent search of the person's vehicle or packages, the officer must have probable cause to believe that a criminal offense has been or is being committed." *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (internal quotation marks omitted). "Whether probable cause exists depends on the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Id.* at 380-81 (internal quotation marks omitted).

The district court determined that there was probable cause to arrest Lewis and Taylor "for violating state drug and traffic laws and for their suspected roles in Henderson-related drug-

trafficking activity." *United States v. Taylor*, No. 1:07-CR-68, 2007 WL 1115194, at *6 (N.D. Ohio Apr. 13, 2007). Of the reasons given by the court, the marijuana-related charges most strongly support the court's finding of probable cause. In addition to witnessing the actions of Lewis and Taylor at the Wendy's restaurant, Agent Verhiley testified that he "could smell a strong odor of burning marijuana emitting from the interior of the vehicle" when he asked Taylor to step out of the minivan. And when Agent Verhiley told Taylor that the officers had witnessed Lewis and Taylor smoking marijuana at Wendy's, Taylor remarked: "I live in California, you're allowed to smoke marijuana. . . . [W]e were just smoking dope. We just get tickets in California." Together, these facts establish that the task-force officers had probable cause to believe that at least one criminal offense was committed by Lewis and Taylor in the minivan, which justifies their arrests. Thus any evidence discovered or statements made as a result of the arrests and vehicular search were properly admitted by the court.

### c. *Search warrant for Room 106*

Lewis and Taylor next contend that the district court erred in finding that probable cause existed to support the search warrant for Room 106 at the Extended Stay America hotel. For "probable cause [to have] existed to issue a search warrant, . . . the facts and circumstances described in the affidavit [must] indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." *United States v. Bowling*, 900 F.2d 926, 930 (6th Cir. 1990) (internal quotation marks omitted). This court "give[s] great deference to an issuing judge's finding of probable cause in a search warrant application; that decision should be reversed only when it was arbitrary." *United States v. Williams*, 544 F.3d 683, 685 (6th Cir. 2008).

Here, the district court determined that Agent Moses's affidavit in support of the search warrant "recites facts and circumstances indicating a fair probability that the police would discover evidence of [] drug trafficking in Room 106." *Taylor*, 2007 WL 1115194, at *6. According to the court, the facts and circumstances that tied Lewis and Taylor to drug trafficking and that demonstrated a nexus between "drugs, large sums of money, Henderson, Madden, Taylor, Lewis, and Room 106 at the Extended Stay America hotel" included:

- Both Lewis and Taylor were Californians with criminal records involving drugs and weapons;

- They were both known to have associated with Henderson, a suspected drug trafficker;

- Both men traveled in January from Los Angeles, a known source-city of PCP, to Cleveland, a known destination for PCP from Los Angeles;

- Lewis told task-force officers that he came with Taylor to see Madden, who was suspected of assisting her husband in drug-trafficking;

- On January 11, 2007, Henderson, Madden, Lewis, and Taylor were all at the Extended Stay America hotel;

- Lewis was registered to Room 106 at the hotel, and a key to the room was found in his pocket;

- In the afternoon of January 11, 2007, Henderson and Madden departed the hotel in a green minivan;

- Shortly thereafter, Lewis and Taylor left Room 106 in a silver minivan owned by Henderson and provided to them by Madden;

- Within an hour, the Henderson-Madden minivan was stopped and approximately $14,000 in cash that smelled of marijuana was confiscated from Madden's pocketbook;

- The Lewis-Taylor minivan was stopped shortly thereafter and marijuana was confiscated from the vehicle; and

- Lewis and Taylor both attempted to conceal the fact that they were staying in Room 106 when questioned by task-force officers, by telling task-force officers that they had spent the night in other hotels.

See id. at *6-7.

Lewis asserts that the affidavit supporting the search warrant did not link him to Henderson's alleged PCP trafficking or establish that evidence of a crime would be found in Room 106. Taylor similarly argues that the affidavit contained no information concerning him or indicating that he was a PCP distributor. Although the district court did erroneously state that Taylor admitted to staying in the Extended Stay America hotel with Lewis, other evidence in the affidavit sufficiently tied both Lewis and Taylor to Henderson's drug trafficking. Agent Moses asserted in his affidavit that Henderson was a known PCP trafficker who transported PCP from Los Angeles to Cleveland; that Henderson, Lewis, and Taylor were all from Los Angeles; that Lewis and Taylor were driving a vehicle owned by Henderson; and that Henderson, Lewis, and Taylor were all at the Extended Stay America hotel moments before $17,000 in cash and checks was found in Madden's pocketbook. Moreover, Taylor claimed that he was unable to recall the exact name or location of where he was staying, but Lewis stated that they were traveling together. They were also seen leaving the Extended Stay America hotel together, and Lewis was registered at Room 106 and had a keycard for the room in his pocket. The affidavit therefore contained statements sufficient to establish probable cause to search Room 106 for drug paraphernalia.

Lewis nonetheless argues that, because he was "not a known drug dealer, there was not sufficient nexus to establish probable cause." He cites *United States v. McPhearson*, 469 F.3d 518 (6th Cir. 2006), in support of his argument. His reliance on *McPhearson*, however, is misplaced.

In *McPhearson*, the defendant was arrested on a simple-assault charge at the front door of his home. While patting McPhearson down incident to the arrest, police officers found crack cocaine in his pocket. On that basis alone, the officers proceeded to obtain a search warrant for his residence. McPhearson, however, claimed that the search warrant lacked probable cause. This court agreed, concluding that the affidavit "did no more than state that McPhearson . . . was arrested for a non-drug offense with a quantity of crack cocaine on his person. . . . A suspect's mere presence or arrest at a residence is too insignificant a connection with that residence to establish that relationship necessary to a finding of probable cause." *Id.* at 524 (brackets and internal quotation marks omitted). Specifically, this court noted that the affidavit lacked any allegation that McPhearson was a known drug dealer: "In the absence of any facts connecting McPhearson to drug trafficking, the affidavit in this case cannot support the inference that evidence of wrongdoing would be found in McPhearson's home because drugs were found on his person." *Id.* at 525.

Lewis stretches the *McPhearson* holding too far by arguing that officers must demonstrate that a suspect is a known drug dealer in order to establish probable cause to search the place where he is staying. This court's chief concern in *McPhearson* was the "absence of any facts connecting McPhearson to drug trafficking." *Id.* True enough, the court noted in *McPhearson* that a common method to establish probable cause is to demonstrate in the affidavit that the suspect is a known drug dealer. But nothing in *McPhearson* indicates that such a fact is the *only* circumstance capable of

-23-

connecting a suspect to drug trafficking. Here, the other facts highlighted by the district court, such as Lewis's and Taylor's relationship with Henderson and Madden (who were themselves known drug dealers), sufficiently connect Lewis and Taylor to drug trafficking to sustain a finding of probable cause.

In sum, the task-force officers had probable cause to stop the silver minivan, arrest Lewis and Taylor, and search Room 106. The district court therefore did not err in denying Lewis's and Taylor's motions to suppress.

**B.      Sufficiency of the evidence to convict Henderson and Taylor**

Henderson and Taylor claim that the district court also erred in denying their motions for judgments of acquittal, arguing that the government presented insufficient evidence to sustain their respective convictions. "We review de novo a challenge to the sufficiency of the evidence supporting a criminal conviction." *United States v. Fisher*, 648 F.3d 442, 450 (6th Cir. 2011) (internal quotation marks omitted). A defendant, however, "bears a very heavy burden" to prevail on such a claim. *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010) (internal quotation marks omitted). "The relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Fisher*, 648 F.3d at 450 (emphasis in original) (internal quotation marks omitted). In addition, "[w]e are bound to make all reasonable inferences and credibility choices in support of the jury's verdict." *United States v. Hughes*, 895 F.2d 1135, 1140 (6th Cir. 1990).

### 1. Taylor's sufficiency-of-the-evidence challenge

Taylor was convicted on one count of conspiracy to distribute at least one kilogram of PCP, in violation of 21 U.S.C. §§ 841 and 846, and on one count of possession of PCP with the intent to distribute the drug, in violation of 21 U.S.C. § 841. Addressing the possession count first, Taylor contends that there was no evidence to show that he knowingly possessed the seven bottles of PCP found in Room 106. The government responds by asserting that Taylor had constructive possession of the PCP. "[C]onstructive possession exists when a person does not have physical possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Hunter*, 558 F.3d 495, 504 (6th Cir. 2009).

To establish Taylor's constructive possession of the PCP, the government first had to demonstrate that Taylor, who was not listed on the hotel registry as an occupant of Room 106, was in fact staying there. The government presented testimony that clothing in Taylor's size and his airplane ticket from Los Angeles to Cleveland were found in a suitcase in the room. In addition, a source from the hotel told Agent Moses that a second guest fitting Taylor's description was staying with Lewis. The task-force officers in Room 103 heard two men exit Room 106 in immediate succession. Moments later, the officers witnessed Lewis and Taylor walk from the side exit of the hotel to the silver minivan. A reasonable juror could therefore conclude that Taylor was staying in Room 106 with Lewis. This is particularly true given that Taylor traveled from Los Angeles on the day after Lewis, had previously made the same trip to Cleveland with Lewis in December 2006, and

shared the same contacts as Lewis to Henderson and Madden, the latter two being known PCP

traffickers.

Taylor contends, however, that even if sufficient evidence connects him to Room 106, there

is no proof that he had possession of the PCP found in the room. But Room 106 remained under

surveillance from the time that Lewis and Taylor were heard exiting the room until the search

warrant was executed. No one else entered or exited during that time frame. And when the officers

executed the search warrant, they testified that an open bottle of PCP sat in the sink, filling the room

with the distinctive chemical odor that PCP emits. Because the PCP was in the open, and the

evidence shows that Taylor was staying in Room 106, a rational juror could reasonably find that he

had control over the drug.

Taylor's intent to distribute the PCP may then be inferred from the large quantity of the drug

that he possessed. *See United States v. Jackson*, 55 F.3d 1219, 1226 (6th Cir. 1995) ("Intent to

distribute can be inferred from the possession of a large quantity of drugs, too large for personal use

alone."). By demonstrating that Taylor possessed the seven one-liter bottles of PCP, the government

necessarily presented evidence sufficient for a jury to find that he intended to distribute the drug.

Taylor also argues that the government failed to prove that he was guilty of participating in

a conspiracy to distribute PCP with Henderson and Lewis. "To sustain a conviction for drug

conspiracy under section 846, the government must prove beyond a reasonable doubt: (1) an

agreement to violate drug laws; (2) knowledge of and intent to join the conspiracy; and

(3) participation in the conspiracy." *United States v. Gardner*, 488 F.3d 700, 710 (6th Cir. 2007).

But the "connection between the defendant and the conspiracy need only be slight." *Id.* at 711.

Although "mere association with conspirators is not enough to establish participation[,] . . . knowledge of and participation in the common purpose and plan of a conspiracy may be inferred from the defendant's actions and reactions to the circumstances." *Id.* (citation omitted).

Here, the evidence was sufficient to demonstrate that Taylor constructively possessed the PCP in Lewis's room and that he had the intent to distribute it. A showing that someone else joined with him in the PCP trafficking was all the government needed to convict Taylor of conspiracy. Given that Lewis was registered as staying in Room 106, which contained seven one-liter containers of PCP, the government has met that burden. Taylor's challenge to his conspiracy conviction therefore fails.

### 2. *Henderson's sufficiency-of-the-evidence challenge*

Like Taylor, Henderson argues that the government's evidence was insufficient to convict him on a count of conspiracy to distribute at least one kilogram of PCP, in violation of 21 U.S.C. §§ 841 and 846. But the evidence that tied Henderson to the conspiracy includes the fact that the silver minivan Lewis and Taylor were driving was registered to Henderson. In addition, Los Angeles County Sheriff's Department Detective John Duncan—who worked in the gang unit of a multi-district task force and specialized in cases involving the Nutty Blocc Crips based out of Compton, California—testified that he knew Henderson, Lewis, and Taylor from his work relating to the gang. Detective Duncan had last seen Henderson on August 25, 2006 when Henderson was with Lewis and Taylor in the yard of a Compton residence. The home was in a neighborhood associated with the Nutty Blocc Crips. When Henderson noticed Detective Duncan, Henderson ran into the house. Detective Duncan detained the three men that day for reasons that were not admitted at trial.

Agent Lucas also testified to several facts connecting Henderson to Lewis and Taylor's room at the Extended Stay America hotel and to the PCP conspiracy. Since 2004, Agent Lucas had been investigating Henderson because he suspected that Henderson had a role in the regular transportation and distribution of PCP originating from California. According to Agent Lucas, Henderson admitted to meeting the two men in Room 106 of the Extended Stay America hotel while his wife stayed in the green minivan parked outside and to loaning Lewis and Taylor the silver minivan.

Agent Lucas's testimony therefore put Henderson in Room 106, but did not necessarily connect him to the PCP. Yet other task-force officers testified that, when they entered Room 106 to execute the search warrant a few hours after Henderson purportedly entered, the smell of PCP was overwhelming. There is no conclusive evidence, however, that the PCP container was open and emitting an odor at the time Henderson was in the room.

But other circumstantial evidence does suggest that Henderson was involved in the distribution of PCP. For instance, approximately $14,000 in cash was found in Madden's pocketbook in the green minivan. Possession of a large amount of cash is an indication of illegal drug distribution. *See United States v. Warman*, 578 F.3d 320, 334 (6th Cir. 2009) (citing the defendant's possession of $2,000 in cash as supporting his conspiracy-to-distribute-drugs conviction); *see also United States v. Young*, 609 F.3d 348, 355 (4th Cir. 2010) (holding that the defendants' possession of a large amount of cash "could be rationally viewed by the jury as evidence of their involvement in a drug-distribution scheme").

Agent Lucas also testified that, during the searches conducted on January 11, 2007, seven cell phones were removed from Henderson's green minivan and three were recovered from the silver

minivan in which Lewis and Taylor were traveling. The possession of so many cell phones is also a telltale sign of drug dealing. *See Young*, 609 F.3d at 355 (concluding that the defendant's possession of multiple cell phones "could [] be viewed by the jury as evidence of a drug-distribution conspiracy"); Aaron Blank, *The Limitations and Admissibility of Using Historical Cellular Site Data to Track the Location of a Cellular Phone*, XVIII Rich. J. L. & Tech. 3, at 15-16 (2011), http://jolt.richmond.edu/v18i1/article3.pdf ("[T]he use of multiple cell phones is a common practice for drug dealing where a person uses different phones to communicate with family, suppliers, and customers."); *see also United States v. Bailey*, 510 F.3d 562, 567 (6th Cir. 2007) (explaining that "dealers often carry *two* cell phones—one to contact customers and one to contact suppliers—so that if police trace the call records of their customers it will not lead to their suppliers" (emphasis in original)) *on reh'g, aff'd in part and amended on other grounds by* 553 F.3d 940 (6th Cir. 2009). Moreover, subpoenaed records from Sprint showed that at least two contacts had been made between the cell phones in the green minivan and those in the silver minivan on the date in question.

Considering the evidence as a whole, a reasonable trier of fact could find that Henderson had knowledge of and intended to join Lewis and Taylor in conspiring to distribute PCP. We accordingly conclude that the government presented sufficient evidence to support Henderson's conspiracy conviction.

## C. Motions for new trials

As a final challenge to their convictions, Henderson, Lewis, and Taylor each moved the district court for new trials after evidence became public in the months following the two trials that Agent Lucas was under investigation for fabricating evidence and committing perjury in other cases.

The defendants claim that, after approximately a year of discovery on the issue, they had uncovered evidence in the government's possession at the time of trial that impeached Agent Lucas's credibility and that should have been disclosed under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).

Grounded in due process, *Brady* requires the government to disclose evidence that is "both favorable to the accused and 'material either to guilt or to punishment.'" *United States v. Bagley*, 473 U.S. 667, 674-75 (1985) (quoting *Brady*, 373 U.S. at 87). To succeed on a *Brady* claim, the defendant must demonstrate that (1) the evidence at issue is favorable to him, (2) the evidence was suppressed by the government, and (3) the suppression prejudiced him. *United States v. Douglas*, 634 F.3d 852, 860 (6th Cir. 2011). The Court in *Giglio* held that evidence impeaching the credibility of a government witness is considered "favorable to the accused" under *Brady*. *See Bagley*, 473 U.S. at 676 (explaining that "[i]mpeachment evidence . . . falls within the *Brady* rule" (citing *Giglio*, 405 U.S. at 154)).

"To establish prejudice, the nondisclosure must have been so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Douglas*, 634 F.3d at 860 (brackets and internal quotation marks omitted). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. "The question is not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Bell v. Bell*, 512 F.3d 223, 236

(6th Cir. 2008) (en banc) (internal quotation marks omitted).  Whether the evidence is material

should be "considered collectively, not item by item." *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).

The district court in the present case concluded that "although the government's conduct is

troubling, because untainted evidence corroborated [Agent Lucas's] testimony, the government's

failure to disclose that alleged impeachment evidence did not prejudice the defendants." *United*

*States v. Henderson*, No. 1:07-CR-68, 2010 WL 3075079, at *1 (N.D. Ohio, Aug. 4, 2010)

(unpublished opinion).  Despite "some confusion in this circuit with respect to the appropriate

standard of review [(de novo or abuse of discretion)] to apply to the denial of a motion for new trial

based on *Brady* violations," *Douglas*, 634 F.3d at 860 (internal quotation marks omitted), we need

not resolve this issue here because, even under the less-deferential de novo standard, we find no error

in the district court's *Brady* decision for the reasons that follow.

### 1.      *Potential impeachment evidence against Agent Lucas*

The defendants contend that each conceivable negative fact that they uncovered about Agent

Lucas is a basis for a *Brady* violation.  The most significant of those facts are summarized as

follows:

- In the 2003 case of "*United States v. Gaviria-Pena*, [United States District Court] Judge [Peter C.] Economus [for the Northern District of Ohio] circulated an opinion granting a defendant's suppression motion that included the following statement:  'These facts, coupled with SA Lucas' demeanor during the evidentiary hearing, raise significant questions regarding whether Pena made this statement, or whether SA Lucas recognized the patent deficiencies in the arrest and then remembered the statement.'  After reviewing Judge Economus's opinion, the government and the defendant agreed that the government would not appeal Judge Economus's suppression order and the government would drop heroin distribution and use of communication facilities charges and the defendant would plead guilty to an

-31-

illegal reentry of a deported alien charge. After receiving Judge Economus's criticism of Lucas's credibility, the government also approached Judge Economus in an *ex parte* proceeding. Defense counsel knew the government would approach Judge Economus and defense counsel stated no objection provided the government would not seek to reverse Judge Economus's order suppressing evidence. At this *ex parte* meeting, the government persuaded Judge Economus to delete his opinion language questioning Agent Lucas's credibility—a statement that would certainly have been *Giglio* material in future cases involving Agent Lucas." *Henderson*, 2010 WL 3075079, at *2.

• In May 2003, Agent Lucas suggested to Thomas Gruscinski, Assistant U.S. Attorney for the Northern District of Ohio at the time, that investigating officers should follow a suspected drug-dealing family after they leave the bank, conduct a traffic stop, "run a drug dog past the money, and when the dog hit on the money, [the officers] could seize it 'just to fuck with them.'" Gruscinski described this interaction with Agent Lucas in a June 9, 2003 memorandum addressed to and reviewed by the then-U.S. Attorney Northern District of Ohio, Gregory A. White. Gruscinski testified that, based on his experience with Agent Lucas, he personally "would not use Special Agent Lucas as a witness" because he did "not consider [Agent Lucas] credible."

• In 2002 and 2003, Special Agent Dean Winslow of the FBI was involved in an investigation of wrongdoing by Cleveland-area police officers in a drug case. Agent Lucas happened to be involved in that case on behalf of the DEA.

During the course of his investigation, Agent Winslow discovered several inconsistencies in Agent Lucas's DEA reports. Agent Lucas's account of a drug transaction was also disputed by other witnesses. Agent Lucas became the target of a civil rights investigation when other, unrelated allegations against him were made, such as that he beat suspects and gathered evidence before search warrants were issued. The U.S. Attorney's Office directed that Agent Lucas was not to testify in any future cases pending the outcome of his civil rights investigation. Agent Lucas was ultimately cleared of those allegations.

The original investigation that Agent Winslow was involved in eventually closed, and he was not able to follow up on the inconsistencies that he uncovered in Agent Lucas's reports. In October and November 2004, Agent Winslow wrote a memorandum summarizing the most pertinent points of his investigation. He wrote that he had remaining questions about Agent Lucas's performance "[b]ecause of the numerous complaints [he] continued to hear."

In Paragragh ZZ of the appendix to the memorandum, Agent Winslow wrote that "the U.S. Attorney's Office had concerns about several investigations wherein Lucas may have lied." He based this statement on what he heard at a meeting that he attended in September 2003 with several members of the U.S. Attorney's Office for the Northern District of Ohio. Agent Winslow did not believe that the U.S. Attorney's Office received a copy of his closing memorandum.

• Some time between February and June 2005, Assistant U.S. Attorney Lori Hendrickson became the prosecutor on a case that Agent Lucas had been investigating. The suspect in the case had already been indicted on a drug charge that carried an advisory U.S. Sentencing Guidelines range starting at 324 months' imprisonment. When Hendrickson took over the case, she determined that the search warrant for the defendant's home, which Agent Lucas had executed, lacked probable cause. Her supervisor at the time ultimately agreed with her conclusion. As a result, she offered the defendant a plea agreement (which he accepted) for lesser charges that resulted in an advisory Guidelines range of only 63 to 78 months' imprisonment. Henderickson testified in the hearing on Henderson's, Lewis's, and Taylor's motions for new trials that she "did not believe that . . . Special Agent Lucas was being forthright with [her] regarding the evidence that had been seized at [the defendant's] residence."

One piece of evidence that the defendants raise as related to the *Brady* issue, but that they were already aware of at the time of trial, is the opinion issued in *United States v. Novaton*, 271 F.3d 968 (11th Cir. 2001). In *Novaton*, the Eleventh Circuit described the following misrepresentation made by Agent Lucas:

The first alleged misrepresentation pointed to by Cuni [(the defendant)] relates to the statement in the affidavits to the effect that the four informants who provided information in support of probable cause had proven reliable in the past. Cuni asserts, and the government does not dispute in its briefs to us, that three of the four informants had never before cooperated with law enforcement officials. Cuni argues that this misrepresentation was inherently false and made with reckless disregard for the truth in light of Agent Lucas' subsequent testimony about when the informants began cooperating. . . .

We find troubling Agent Lucas' apparent misrepresentations concerning the past cooperation of the informants involved in this case. Although the government

-33-

> maintains that there was an absence of proof concerning the agent's deliberateness or recklessness in making the misrepresentations, it is unclear how Agent Lucas could have made such statements of an affirmative character for which there was no basis without having acted either deliberately or recklessly. Accordingly, we will assume that this was a deliberate or reckless misrepresentation.

*Id.* at 987.

Henderson cited *Novaton* in a pretrial motion in which he requested that the government disclose any evidence related to the confidential informants cited in Agent Moses's affidavit supporting the search warrant for Room 106. His motion was denied. The defendants nonetheless cite *Novaton* as important in the *Brady* calculation because they claim that it validates their argument that the government was clearly aware of Agent Lucas's questionable credibility.

### 2. *Materiality of the potential impeachment evidence*

Agent Lucas testified against the defendants in the suppression-hearing proceedings and in the two trials. The Sixth Circuit has never decided whether *Brady* protections are applicable to a suppression hearing. *See United States v. Bullock*, 130 F. App'x 706, 723 (6th Cir. 2005) ("It is hardly clear that the *Brady* line of cases applies to suppression hearings." (brackets omitted) (quoting *United States v. Bowie*, 198 F.3d 905, 912 (D.C. Cir. 1999)). A number of other circuits have also avoided answering this question. *See, e.g.*, *United States v. Stott*, 245 F.3d 890, 902 (7th Cir. 2001); *Bowie*, 198 F.3d at 912; *United States v. Williams*, 10 F.3d 1070, 1077 (4th Cir. 1993). The only two circuits that have actually ruled on this issue, however, have determined that *Brady* does apply to suppression hearings. *See United States v. Barton*, 995 F.2d 931, 935 (9th Cir. 1993); *Smith v. Black*, 904 F.2d 950, 965-66 (5th Cir. 1990), *vacated on other grounds*, 503 U.S. 930 (1992). Assuming without deciding that *Brady* applies to suppression hearings, we nonetheless conclude that

the evidence about Agent Lucas was not material to the suppression-hearing proceedings or to the trials held in this case.

One factor mitigating against a finding of materiality is that there are practical difficulties with requiring the disclosure of much of the evidence that the defendants highlight. For example, Assistant U.S. Attorney Hendrickson testified that she doubted Agent Lucas's veracity with regard to a search warrant that he executed. Her opinion of Agent Lucas's truthfulness is clearly admissible under Rule 608 of the Federal Rules of Evidence, but whether her opinion is the type of evidence that the government should be required to disclose under *Brady* is doubtful. Although each "prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police," *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), asking the government to convey every undocumented negative opinion about its testifying officers would stretch the *Brady* requirement beyond what is practicable. *See United States v. Agurs*, 427 U.S. 97, 109 (1976) ("If everything that might influence a jury must be disclosed, the only way a prosecutor could discharge his constitutional duty would be to allow complete discovery of his files as a matter of routine practice. . . . [T]he Constitution surely does not demand that much.").

Also questionable in terms of *Brady* disclosure are the allegations about Agent Lucas that were not sustained after investigation, such as the remark in paragraph ZZ of FBI Agent Winslow's memorandum that "the U.S. Attorney's Office had concerns about several investigations wherein Lucas may have lied." The government's argument that such unsubstantiated allegations are not material under *Brady* is compelling. *See Agurs*, 427 U.S. at 109 & n.16 (commenting that the prosecution has no "obligation to communicate preliminary, challenged, or speculative information"

-35-

(internal quotation marks omitted)). No court, to our knowledge, has held that *Brady* mandates the disclosure of internal memoranda on the basis that they contain unsubstantiated conjecture about a testifying officer.

On the other hand, the documents containing fact-based conclusions about Agent Lucas, including the original opinion written by Judge Economus and former Assistant U.S. Attorney Gruscinski's memorandum, do not raise any logistical concern; they could have easily been gathered and turned over by the prosecution. But the government argues that extrinsic impeachment evidence is not material under *Brady* because it is not admissible under Rule 608(b) of the Federal Rules of Evidence. At the time of trial, Rule 608(b) provided that "[s]pecific instances of the conduct of a witness, for the purpose of attacking . . . the witness'[s] character for truthfulness, may not be proved by extrinsic evidence." Fed. R. Evid. 608(b) (2007) (amended Dec. 1, 2011). This court, however, has held that "information withheld by the prosecution" need only "lead directly to[] evidence admissible at trial" in order to be material under *Brady*. *United States v. Phillip*, 948 F.2d 241, 249 (6th Cir. 1991). In addition, although the documents themselves may not be admitted as extrinsic evidence, the events that they record may still be inquired into on cross-examination. Fed. R. Evid. 608(b) (2007) (amended Dec. 1, 2011) ("They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness . . . .").

But we conclude that there is no "reasonable probability" that the defense's ability to further impeach Agent Lucas would have changed any of the verdicts. The district court ruled that Agent Lucas's testimony was corroborated either by the testimony of other officers or by independent

objective evidence. Neither Lewis nor Taylor dispute this fact on appeal. Because Agent Lucas's

testimony against them was independently corroborated, the impact that any impeachment might

have had is greatly lessened. *See United States v. Douglas*, 634 F.3d 852, 861 (6th Cir. 2011)

(finding the undisclosed conviction of a prosecution witness nonprejudicial because, among other

reasons, "any statements he made regarding Defendants' actions were corroborated by other

witnesses" (internal quotation marks omitted)). "The mere possibility that an item of undisclosed

information might have helped the defense, or might have affected the outcome of the trial, does not

establish 'materiality' in the constitutional sense." *Agurs*, 427 U.S. at 109-10.

As for Henderson, the district court noted one issue for which Agent Lucas was the sole

witness against him at the suppression hearing:

> Agent Lucas and Henderson provided conflicting testimony at the suppression
> hearing regarding Henderson's indication that he wanted to speak to a
> lawyer. . . . Agent Lucas discussed Henderson's recalcitrance and noted that
> "HENDERSON stated that once he talked to his attorney, he would cooperate with
> police." Thus, the Court finds that Henderson may have referred to an attorney
> during his January 11, 2007 interview with Special Agent Lucas, but credit's [sic]
> Lucas's suppression hearing testimony that Henderson did not specifically request
> a lawyer to continue the interview.

*United States v. Henderson*, No. 1:07-CR-68, 2007 WL 1115195, at *5 (N.D. Ohio Apr. 13, 2007).

Had the court credited Henderson's testimony over Agent Lucas's, then his incriminating statements

regarding Lewis and Taylor would have been suppressed. The government does not address this

issue in its responsive brief. But given that the district court was aware of the *Novaton* case, the

additional allegations in Judge Economus's original opinion and the Gruscinski memorandum are

unlikely to have further impugned Agent Lucas's reputation to any significant degree, especially

because the documents themselves were inadmissible. And none of Agent Lucas's questionable behavior in those documents related to lying about a defendant's request for counsel.

Henderson also argues that Agent Lucas provided the "sole evidence" of Henderson's participation in the PCP conspiracy at his trial. Although this is clearly an exaggeration, Agent Lucas did provide important evidence connecting Henderson to the conspiracy. Specifically, Agent Lucas testified that Henderson admitted visiting Lewis and Taylor in Room 106. But other evidence independently established that Henderson had previously associated with Lewis and Taylor and that he was at the Extended Stay America hotel: Henderson was witnessed leaving the area of Room 104 or 106 by a hotel employee; Detective Duncan testified that Henderson was in the Nutty Blocc Crips with the two men; Lewis and Taylor were pulled over while driving a silver minivan that Henderson owned; and cell phone communications occurred between the two minivans. Nothing other than Agent Lucas's testimony, however, puts Henderson in Room 106 where the seven liters of PCP were stored. But again, the critical weakness of Henderson's argument is that the evidence uncovered about Agent Lucas would have led to nothing more than an incremental opportunity to impeach him. Because Henderson did not use the *Novaton* opinion to impeach Agent Lucas, his claim that he would have used the undisclosed evidence to do so is questionable.

We agree with the district court's conclusion that "the lengths to which the government went to protect Agent Lucas . . . are troubling," but that does not affect the materiality determination. *Henderson*, 2010 WL 3075079, at *2 . "If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Agurs*, 427 U.S. at 110. The undisclosed evidence against Agent Lucas was unsubstantiated, and his testimony at the

suppression-hearing proceedings and at trial was largely corroborated by other evidence.  We

therefore find no error in the district court's denial of the defendants' new trial motions.

### III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.